**2024 IL 128373**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 128373)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
DARRELL FAIR, Appellant.

*Opinion filed February 16, 2024.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Cunningham, and Rochford concurred in the judgment and opinion.

Justice Neville dissented, with opinion, joined by Justice O'Brien.

## OPINION

¶ 1    In this case, we confront for the first time questions of what constitutes a claim of torture under the Illinois Torture Inquiry and Relief Commission Act (Act) (775 ILCS 40/1 *et seq.* (West 2018)) and what standards apply when a circuit court reviews a claim referred by the Torture Inquiry and Relief Commission

(Commission). Petitioner, Darrell Fair, appeals the circuit court's denial of his claim of torture, following an evidentiary hearing. After construing the Act and clarifying the standards at issue, we hold that a court analyzing a claim of torture referred for review under the Act must consider the totality of the circumstances— including any allegations of constitutional violations that would not by themselves support a freestanding claim of torture under the Act. In other words, in reviewing a torture claim upon referral from the Commission, the circuit court must consider the entirety of the circumstances occurring in connection with a claim that a petitioner has been tortured into confessing. However, we ultimately conclude that the circuit court's determination in this case that petitioner failed to prove his claim of torture was not manifestly erroneous. Thus, we affirm the appellate court, on other grounds, and affirm the circuit court.

¶ 2                                   I. BACKGROUND

¶ 3       An extensive recitation of the facts can be found in the appellate court order. 2021 IL App (1st) 201072-U. We summarize the facts necessary to resolve the issues presented.

¶ 4                                 A. Underlying Events

¶ 5       Outside a bar around midnight on July 22, 1998, Chris Stubblefield and William Jones were robbed at gunpoint. Stubblefield was shot and killed as he attempted to flee. Chicago police arrested petitioner in connection with the robbery on September 1, 1998. Petitioner was transported to Area 2 for interrogation. During interrogation, petitioner made an inculpatory statement indicating that he, Chris Thomas, and Lamont Reaves were driving around searching for someone to rob. According to petitioner, he obtained a gun from a friend, which Reaves used to rob Stubblefield and Jones. When Stubblefield attempted to flee, Reaves pursued him, took his money, and shot him in the back. Shortly after he made the inculpatory statement, a handwritten statement was prepared by Assistant State's Attorney (ASA) Adrian Mebane, which petitioner refused to sign or initial.

¶ 6       The written statement detailed petitioner's involvement in the murder, stating he provided a gun to Reaves, who proposed they rob someone. Eventually, with

Thomas driving petitioner's car, all three men went to a bar, where Reaves robbed Stubblefield and Jones and shot Stubblefield as he tried to flee. Petitioner admitted giving Reaves a ride to the bar to meet friends but otherwise claimed he was not involved with what happened there.

¶ 7        The parties agree that several police officers were involved in petitioner's initial arrest or interrogation at Area 2. Detective Ted Przepiora took part in the arrest of petitioner at his mother's house and brought him to the Area 2 police station, where he had brief interactions with petitioner. At the station, Detective Michael McDermott initially interrogated petitioner before Detectives Maverick Porter and Al Brown took over and conducted most of the interrogation. Mebane arrived toward the end of this period and participated in taking statements from petitioner but was not present for most of his time in custody.

¶ 8        Petitioner was indicted on September 28, 1998, on three counts of first degree murder and one count of armed robbery. Prior to trial, petitioner filed three motions to suppress statements. The first two versions, filed in August 1999 and March 2000, contained no allegations of specific conduct. Instead, the motion contained "boilerplate" language indicating "the statements sought to be suppressed were obtained as a result of physical, mental, and psychological coercion." The third version of the motion, filed October 25, 2000, stated that petitioner "specifically asked for an attorney to speak with but the police did not allow this request" and alleged that "a short White police officer with cowboy boots kicked defendant on his shins." The motion also alleged the statements were obtained as a result of "psychological and mental coercion" from the officers' denial of petitioner's "asthma medication" and food. None of the motions named McDermott as an officer involved in the arrest or interrogation of petitioner.

¶ 9        On January 30, 2002, petitioner appeared in court with counsel, who asked to withdraw the final motion to suppress statements. When the court asked petitioner if he understood that the motion to suppress was being withdrawn, petitioner replied, "yes ma'am." When the court continued and asked petitioner, "is that your agreement," petitioner stated, "that's fine." Years later, at his hearing upon referral of the matter from the Commission to the circuit court, petitioner testified defense counsel advised him that the judge might suppress the unsigned written statement but not the oral statement that preceded it and that the best available trial strategy

was to argue the written statement was a fraud.

¶ 10 B. Petitioner's Trial, Posttrial Proceedings, and Direct Appeal

¶ 11 A pretrial disclosure listed Mebane and Detectives Przepiora, Brown, Porter, and McDermott, among others, as potential witnesses in the case. Mebane, Przepiora, and Porter testified at trial, but McDermott and petitioner did not.

¶ 12 Mebane testified that he arrived at Area 2 around 6 p.m. on the evening of September 2, 1998, and sometime after that first spoke with petitioner, after police had already been interviewing petitioner for hours. Mebane stated he wrote out a statement with petitioner as part of a back-and-forth conversation. Mebane relayed that petitioner said he had been treated "good" by everyone, he had something to eat, and no threats or promises had been made in exchange for his statement. He testified that they reviewed the statement together "throughout as we went along and also at the end." Strikethroughs and changes were made in various places throughout the statement, and Mebane placed his initials by the changes, but petitioner refused to add his initials or to sign the statement without first talking with a lawyer. Mebane signed the statement.

¶ 13 Mebane testified that he read out loud a preprinted section listing an arrestee's *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), then wrote petitioner's name on a signature line underneath it, but petitioner refused to sign his own name. On cross-examination, Mebane stated that he thought petitioner would sign somewhere close to where he printed petitioner's name on the *Miranda* form, "[w]hen we were finished with the statement." Mebane stated that petitioner "told me *** at some point during the statement" that he would not initial or sign and "also said it again at the end" but did not say so at the beginning. When asked on cross-examination why changes made early in the statement were not initialed by petitioner, Mebane responded, "I didn't ask him to yet." Mebane agreed that one of the changes he made on the first page of the statement would have occurred "early" on in the discussion with petitioner, at which point Mebane added his own initials, but he did not ask petitioner to add his initials at that time.

¶ 14 A jury convicted petitioner on one count of first degree murder by accountability. In his statement in allocution at sentencing, petitioner stated that, while being interrogated, he was

> "chained to a wall *** and I was kicked and beaten repeatedly. *** And I asked for a lawyer repeatedly, and I was constantly refused. And the only time I was fed was when I said that I would talk to one of the police officers, a Mr. Porter. The statement that they claimed that I said *** wasn't the facts."

The trial judge responded by stating that she believed petitioner's assertions were "an absolute lie." The court expressed confidence that petitioner was not abused and that ASA Mebane had not made up the statement. Ultimately, the court sentenced petitioner to 50 years in prison. When petitioner appeared before the circuit court seeking reconsideration of his sentence, he tendered a letter indicating his untreated drug addiction led to his participation in the robbery and that he and his codefendant "took Mr. Stubblefield's life." The letter made no mention of any alleged abuse petitioner suffered while being interrogated.

¶ 15 On appeal, petitioner argued, among other things, that trial counsel was ineffective for failing to proceed on the motion to suppress the statements or object to their admission. The appellate court affirmed.

¶ 16                         C. Postconviction Petition

¶ 17 In a *pro se* postconviction petition, filed July 28, 2005, petitioner again argued ineffective assistance of trial counsel, asserting that during his interrogation police officers repeatedly refused his requests for a lawyer and for medication he needed for asthma and "a severe skin condition." He stated that a short, white detective wearing cowboy boots entered the interview room, yelling at him and accusing him of murder and, when petitioner denied this, the detective "started to kick defendant in his lower left leg with his right booted foot," while resting his hand "on his holstered weapon," which put petitioner "in fear of being shot." Petitioner asserted that he suffered "20 min. of continuous verbal and physical abuse" before the detective left.

- 5 -

¶ 18 Petitioner asserted Porter and Brown then took over his interrogation; his continued requests for a lawyer were ignored or refused; and he was deprived of sleep, requested medication, and food until he agreed to make a statement, which was not true. The circuit court summarily dismissed the petition, and the appellate court affirmed, then affirmed again following remand from this court to reconsider its initial judgment pursuant to *People v. Hodges*, 234 Ill. 2d 1 (2009).

¶ 19                          D. Claim of Torture

¶ 20 Petitioner filed a claim of torture with the Commission in May 2011, alleging:

"I was kicked in lower leg and threatened to be shot—while Det. rested his hand on service weapon. I was kept awake, chained to metal ring on wall, denied asthma medication + food—for period over 30 hours, I was also denied access to lawyer."

¶ 21                        E. Commission Hearing

¶ 22 In a recorded phone call interview with Commission staff in June 2012, petitioner detailed his history of severe asthma and skin allergies that could cause him to break out in hives. He noted these conditions had since improved, but in the years leading up to the time at issue, petitioner had to go to the emergency room for breathing issues and needed to use prescription albuterol and steroid inhalers every 10 to 12 minutes to help him breathe. He described police officers including Przepiora arresting him at his mother's house, alleging they threatened to shoot him through the door if he did not let them in, and during his arrest he asked but was not allowed to bring his inhalers. In the interrogation room at Area 2, his asthma flared up, and it felt like he was "breathing through a straw." Officers ignored or denied his requests for medication or told him they would have to go to the hospital and then "start the whole process over again." After the interrogation he was processed at the Cook County jail and eventually received prescription inhalers and Benadryl.

¶ 23 Petitioner also described a short, white detective in cowboy boots—whose name petitioner noted he did not know—who shouted at him and kicked him in the

leg, then rested his hand on his holstered gun, daring petitioner to make a move so the detective could "waste" him. Commission staff asked petitioner how many times the unnamed detective kicked him, and petitioner answered, "just once." Petitioner noted this same detective testified in another case in Markham, and petitioner thought he might be able to inquire and obtain the detective's name from that case; Commission staff encouraged petitioner to determine the detective's name.

¶ 24 Petitioner stated he was in the interrogation room for more than 30 hours but could not sleep for a variety of reasons—police coming into the interrogation room, his asthma condition, the cold temperature in the room, and his light clothing. He stated his repeated requests for a lawyer were ignored or denied and he was also denied food until he began cooperating toward the end, at which point he began repeating what the police told him to say. Petitioner discussed the process of creating the written statement, including that he refused to sign the statement Mebane created and that Mebane wrote petitioner's name on it himself.

¶ 25 F. Commission Case Disposition Referral Order

¶ 26 The Commission issued a case disposition report in May 2013, concluding there was sufficient credible evidence of torture to refer the case for judicial review. See *In re Claim of Fair*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.018-F, at 3 (2013), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/ decisions/Case%20Disposition%20Darrell%20Fair.1.0.pdf [https://perma.cc/ LNF2-UPXL] The report noted a lack of corroborating physical evidence or a pattern of similar conduct by named police officers but cited troubling issues with the handwritten statement and the prosecutor's "dubious testimony" about preparing the statement, which provided "significant indicators of the fact that it was not voluntarily made." *Id.* It also noted there was essentially no other evidence against petitioner beyond the statement, which created "a powerful incentive" to obtain it. *Id.*

¶ 27 G. Circuit Court Review

¶ 28    The circuit court initially granted a motion by the State to dismiss the referral, but the appellate court reversed the circuit court's finding that petitioner's claim fell outside of the Commission's jurisdiction and remanded for further proceedings. *Mitchell v. State*, 2016 IL App (1st) 141109.

¶ 29    An evidentiary hearing was held beginning in April 2019, during which testimony was presented by, among others, petitioner and Mebane. Petitioner testified on direct examination to the following. Police officers including Przepiora arrested him in the morning at his mother's house, threatening to shoot him through the door if he did not open it. He asked them to collect and bring his asthma inhalers and medication for a skin condition, but this was ignored. Petitioner had "chronic asthma and a skin condition" at the time that have since improved. He previously had to go to the emergency room "several times" for asthma symptoms. Przepiora took him to an interrogation room at Area 2, where he was handcuffed to a metal ring on the wall while sitting on a bench. Requests for asthma medication and to speak with a lawyer were ignored. Petitioner's asthma condition "got progressively worse" in a stressful situation like this.

¶ 30    Next, a white detective who was about "five-six, five-five *** maybe 130, 40 pounds" and "wearing cowboy boots" came in the room and started calling petitioner names in a "[l]oud, aggressive" tone, "just in a rage," and he got "right in" petitioner's face. Petitioner identified a photo of the detective. The detective then kicked petitioner hard in his lower left leg, just under the knee, which felt like "someone just took a bat and hit me *** just straight to the bone," causing "intensive pain." He noted the detective brought the bottom of his boot down against "the bone under my knee. It's all bone right there. I had on short pants. It was excruciating pain."

¶ 31    The detective then put his hand on his gun and dared petitioner to "go for it, make a move for it" and said he would shoot him. The detective tried to kick petitioner again, "numerous times," but petitioner was able to use his free arm to cover up and attempt to block or avoid these additional kicks, so they did not land "squarely" on his legs again. He demonstrated these movements for the circuit court, moving his leg side to side while covering it with one arm. The detective continued calling petitioner names and tried to kick him "every few seconds," but petitioner was able to somewhat block or avoid the "full contact," so these became

only "glancing blows." He eventually left the room. Petitioner was bleeding from where "the flesh was scraped off the bone part of my lower knee" and dabbed at the blood with an old tissue from the ground. The detective came back one more time and was still aggressive but only made accusations and did not attempt to strike petitioner again.

¶ 32 Detective Porter came into the room afterwards. Petitioner told him about the attack and asked for asthma medication, as it was becoming difficult to breathe, with his airways "just closing up." Porter deflected and continued talking about the murder. Petitioner also asked for a lawyer, and Porter eventually left. The lights in the room stayed on all the time, and he was unable to sleep throughout the period of more than 30 hours he spent there, with his arm shackled to the wall and no way to lie down. He was also hungry and had not eaten since the night before being arrested in the morning.

¶ 33 Porter and his partner, Brown, came in multiple times over the next several hours to ask him questions about the murder, and his breathing "was getting worse and worse" to where he could not say a whole sentence without coughing. A female ASA, whose name petitioner did not know, entered the room with the officers at one point, asked "what's wrong with him," and was ushered out. Porter later returned, and petitioner asked for asthma medication and food. Porter said he had to start talking and give them "something" if he wanted to eat. Petitioner then stated he was outside the bar on the night at issue, trying to sell bottles of alcohol. Porter left and brought two hamburgers and fries for petitioner to eat, the only food he had while at Area 2.

¶ 34 Afterwards, Porter started making very specific allegations. He noted they knew petitioner did not do anything and was not "the target of our investigation." Porter said if he repeated what they told him to say, petitioner would be able to go home. Petitioner explained he eventually went along so that he could get his "asthma pump" and because, up to that point, "one guy was kicking me, threatening to shoot me. I was chained to the metal ring in the wall. I wasn't getting any food, sleep, asthma medication." However, once he started talking with the police, they promised to get him food and said he would "be released." Denial of petitioner's requests for a lawyer contributed to the feeling that "no regular rules that you think would apply in a police station was happening," and instead, he was "just in

survival mode" to the point that he "wasn't sure what was going to happen" if he did not cooperate. He explained he was scared and "couldn't breathe" by that point and "didn't know how much longer I could just go on without any kind of medication or getting out of there."

¶ 35    ASA Mebane then came in and wrote down petitioner's statement, asking a few basic questions and then sitting back as Porter asked questions and petitioner gave answers that went along with the narrative Porter had given him. At the end, Mebane asked petitioner to sign the statement, and petitioner refused to sign without talking to an attorney first. He explained that he did not feel comfortable signing his name to something "I know is not accurate." Eventually petitioner was taken away.

¶ 36    On cross-examination petitioner agreed he did not know the name of the white detective with cowboy boots at the time of submitting his torture claim but was able to learn it later. Petitioner explained he determined McDermott was the officer who kicked him from police reports and by looking at photos of Area 2 officers with other inmates, first seeing his photo in a newspaper article about the Jon Burge trial. Petitioner did not know the names of the other inmates "offhand."

¶ 37    Petitioner denied refusing to go to the hospital for medical treatment while at Area 2, stating he continued to ask for his medication. The prosecutor pushed back on when petitioner eventually received medication at the Cook County jail, whether this occurred at initial processing or upon being assigned to a division later, and on petitioner's symptoms while at Area 2.

¶ 38    Mebane testified that he did not observe all of petitioner's interrogation. He discussed what his general practices as an ASA were at the time. Mebane stated his "best memory" of his practice after reading *Miranda* warnings was that he would write a suspect's name below the preprinted language and would ask the suspect at that time if he or she wanted to sign it, before going into the substance of the statement. When making any changes or additions to a written statement, Mebane believed his practice was to ask the suspect to also initial the edits at the time they were made, while adding his own initials. After having his memory refreshed by the contents of the written statement and petitioner's arrest report, Mebane confirmed details contained within those documents. Mebane explained that, in general, he had no independent recollection of the events at issue.

¶ 39    Mebane believed he asked petitioner how he had been treated by the police and would have documented his answer in the statement. Counsel and Mebane went through each of the other 33 written statements he had taken while in felony review, with Mebane admitting each of the others included a version of the statement that the suspect stated he had been treated well by the police and by himself. Mebane conceded that only petitioner's statement was silent on treatment by the police. Mebane then stated, "I don't remember," when asked what petitioner told him about how he was treated by the police.

¶ 40    On cross-examination, Mebane stated that petitioner did not appear to be in distress, have difficulty breathing, ask for medical attention, or have hives or markings on his body. Mebane said he did not fabricate the statement. He denied that petitioner told him about being kicked or threatened and stated "[n]ot that I recall, no," when asked whether he recalled any injuries on petitioner, who was wearing shorts.

¶ 41    On redirect examination, Mebane stated he did not remember when petitioner first told him he would not sign the written statement but believed it most likely would have been early in the statement. As to when he asked petitioner to sign the *Miranda* warning, Mebane stated "I don't know. Again, my practice was probably to ask that then, but I don't remember specifically."

¶ 42    Atsia Fair, petitioner's mother, testified that petitioner's asthma condition sometimes required trips to the hospital for severe symptoms that left him unable to breathe easily. He had "terrible breathing problems," such that he "couldn't breathe and had to have medication to rectify it," regularly using inhalers or getting breathing treatments at the hospital. She noted petitioner was also allergic to grass and exposure could cause him to break out in hives. She could not recall anything other than dealing with grass or greenery causing him to break out in hives.

¶ 43    As to McDermott, the State noted it "made numerous efforts to attempt to serve Mr. McDermott to appear" as a courtesy to petitioner but that he was "certainly not cooperating." Petitioner's counsel filed an affidavit chronicling his investigator's repeated unsuccessful efforts to serve McDermott.

¶ 44    McDermott's history of dishonesty and abuse in other cases was also presented, showing that McDermott invoked the fifth amendment in multiple cases and

- 11 -

ultimately received immunity to testify against Burge in federal proceedings. McDermott had resigned from his job while on suspension pending termination in relation to submitted charges and sustained findings of perjury and with sufficient evidence to seek his indictment for battery, perjury, and obstruction of justice. Documents were presented on allegations of abuse by McDermott in other cases featuring threats with a gun, kicking or otherwise striking a restrained suspect, withholding of medication, denial of the right to counsel, or denial of food and sleep over a lengthy period of interrogation to force a suspect to confess to a crime.

¶ 45       After hearing the evidence, the circuit court, in a 53-page order, denied petitioner relief, finding petitioner "failed to provide sufficient evidence of torture to meet his burden." In its detailed order, the circuit court noted how over time petitioner changed his account of what occurred. For example, his story changed regarding the nature of the alleged abuse, whether a gun was involved, the extent of McDermott's involvement in his interrogation, how it came to be that he was given food, and his physical condition during and immediately after the interrogation. The circuit court also found the details of petitioner's eventual identification of McDermott "troubling," concluding that his "alleged ignorance about the identity of his alleged abuser" and "subsequent identification of McDermott" were not credible where it was not until after his 2012 interview with the Commission that petitioner identified McDermott.

¶ 46       In contrast, the court found Mebane to be an "extremely" credible witness and rejected the Commission findings of fact against him. Pointedly, the court noted that the Commission "made no attempt to interview Mebane regarding his testimony or the written statement." Next, the court addressed and explicitly rejected each finding the Commission raised regarding how Mebane took the statement of petitioner, explaining its assessment of Mebane's testimony. The court found no evidence that Mebane attempted to forge petitioner's signature where Mebane was "forthright about the fact that petitioner did not want to sign the statement, and even documented petitioner's stated reason for not signing in the body of the written statement itself." The court credited Mebane's testimony during the hearing recalling his general practices when taking statements and found his testimony was corroborated by other written statements taken by Mebane. Ultimately, citing *People v. Wilson*, 2019 IL App (1st) 181486, the court determined that petitioner failed to meet his initial burden, and if petitioner did meet

his initial burden, the State met its burden to show petitioner's statement was "nonetheless voluntary." Thus, the court denied petitioner relief. Petitioner appealed.

¶ 47                           H. Appellate Court Decision

¶ 48    The appellate court affirmed the circuit court's denial of relief, but on different grounds. 2021 IL App (1st) 201072-U. Also citing *Wilson*, the court determined it would analyze petitioner's claim through the same burden-shifting process for reviewing a postconviction petitioner's claim that a statement was involuntary:

> "A petitioner's initial burden is the same under the Post-Conviction Hearing Act and the Torture Act. [Citation.] A petitioner must show that new evidence would likely have resulted in the suppression of his confession. [Citation.] If the petitioner satisfies this initial burden, then the State must show the petitioner's statement was voluntary. [Citation.] After the State establishes its *prima facie* case that the statement was voluntary, the burden shifts to the petitioner to present evidence that it was involuntary." *Id.* ¶ 98.

¶ 49    Contrary to the circuit court, the appellate court concluded that "petitioner presented consistent, unrebutted allegations and testimony that he was kicked by Detective McDermott." *Id.* ¶ 101. Unlike the circuit court, the appellate court "accept[ed] petitioner's unrebutted and consistent claims of being kicked by McDermott as true." *Id.* ¶ 106. Nonetheless, the appellate court noted that the circuit court found Mebane was credible and concluded that, on the record before it, it would not find that determination was against the manifest weight of the evidence. *Id.* ¶¶ 106-09.

¶ 50    The appellate court agreed with petitioner that there was no contrary police testimony rebutting the abuse and that Mebane "was not present during the initial 30 hours he was in police custody" (*id.* ¶ 111) but also noted the "kicking incident with McDermott occurred the day before petitioner gave a statement to" Mebane (*id.* ¶ 113). The court determined that allegations of being denied "adequate sleep, medication, or something to eat before giving an inculpatory statement" (*id.* ¶ 111) were insufficient and that being denied the right to counsel "was not a consequence of torture" (*id.* ¶ 112) that can be reviewed under the Act. The appellate court

- 13 -

ultimately affirmed the circuit court's alternate holding that the State met its burden to show the statements "were voluntary and not the product of torture." *Id.* ¶ 113.

¶ 51    The appellate court added a supplemental order upon denying a petition for rehearing filed by petitioner. *Id.* ¶ 114. In it, the court rejected petitioner's argument that it had erroneously determined what constituted torture in the case by refusing to consider allegations of a denial of the right to counsel within the totality of the circumstances or by overlooking the law of attenuation for claims of a coerced confession. *Id.* ¶ 116. Instead, it noted it rejected that argument by concluding a denial of the right to counsel was not a question that was properly before the circuit court under the Act, and therefore it did not need to consider attenuation. *Id.*

¶ 52    The appellate court then held that "under the Torture Act this court's authority is restricted to consideration of the allegedly tortuous conduct triggering the referral to the circuit court." *Id.* ¶ 117. It noted a petitioner still has the burden under the Act to prove before the circuit court " 'that he has been *tortured*.' " (Emphasis in original.) *Id.* ¶ 119 (quoting *People v. Christian*, 2016 IL App (1st) 140030, ¶ 95). The appellate court also discussed the *Wilson* court's adoption of burden shifting from the motion-to-suppress context but concluded the statutory test "remains whether the petitioner has demonstrated by a preponderance of the evidence that his confession resulted from torture." *Id.* ¶ 121.

¶ 53    Petitioner filed a petition for leave to appeal, which we allowed. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021). We additionally granted requests for leave to file *amicus* briefs in support of petitioner's position by the following: the Illinois Torture Inquiry and Relief Commission; the Chicago Torture Justice Center; and the Innocence Project, together with The Roderick and Solange MacArthur Justice Center, the People's Law Office, and the Center on Wrongful Convictions. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 54                                II. ANALYSIS

¶ 55    Petitioner raises two issues on appeal. First, petitioner argues the appellate court erred by excluding from its consideration of his claim the effect of allegations of additional constitutional violations that would not by themselves support a freestanding claim of torture under the Act. Second, petitioner asserts the circuit

- 14 -

court erred by denying his claim.

¶ 56                    A. Standard of Review and Standards for an
                           Evidentiary Hearing Under the Act

¶ 57    The parties dispute the applicable standard of review on appeal. Petitioner notes that, in determining whether a defendant's statement should have been suppressed, this court uses a two-part standard of review and asserts that bifurcated standard should apply here. Under this proposed approach, the circuit court's factual findings are reviewed based on the manifest weight of the evidence, while this court reviews *de novo* the question of whether the confession was ultimately voluntary. *In re G.O.*, 191 Ill. 2d 37, 50 (2000). In contrast, the State asserts that the standard of review should be *de novo* when reviewing the interpretation of a statute (see *People v. Casler*, 2020 IL 125117, ¶ 22) and otherwise believes the manifest error standard applies as the "typical appellate standard of review for findings of fact made by a trial judge" (*People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998)).

¶ 58    Furthermore, the parties dispute the burdens of proof and production and with whom they rest in an evidentiary hearing following a Commission referral for judicial review. Petitioner asserts such a hearing is identical to a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), where the circuit court determines whether the evidence presented would likely have altered the result of a pretrial suppression hearing. See, *e.g.*, *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80. Petitioner notes the parties argued at the evidentiary hearing based on this standard under *Wilson*, 2019 IL App (1st) 181486, ¶ 52, and both the circuit and appellate courts cited *Wilson* in their analyses. Under this approach, petitioner argues he was first required to make an initial showing that newly discovered evidence likely would have altered the result of a suppression hearing, the State then had the burden of proving a *prima facie* case of voluntariness, and finally, petitioner had a burden to prove the statements were involuntary by a preponderance of the evidence. *Id.* ¶¶ 51-53.

¶ 59    The State argues that *Wilson* was "incorrect" in looking to evidentiary hearing proceedings under the Postconviction Act for guidance on interpreting the

proceedings in a case referred for judicial review. The State asserts the plain language of the Act requires courts reviewing referred cases to determine whether a petitioner has proved his or her torture claim by a preponderance of the evidence.

¶ 60    Petitioner asserts forfeiture applies where the State failed to raise this argument below. Although we agree it would have been better for the State to have raised and developed this argument before the appellate court, we nonetheless elect to consider the State's argument on the applicable standards in order to provide guidance on these issues. *People v. Sophanavong*, 2020 IL 124337, ¶ 21 (invoking the principle that "forfeiture is a limitation on the parties and not the court"). We note the issue of what standard of review applies on appeal is closely tied to the issue of what standards apply to an evidentiary hearing under the Act, and so we will consider those questions together.

¶ 61    The parties' arguments largely rely on competing interpretations of the Act itself. The construction of a statute is a question of law, which we review *de novo.* The primary objective of statutory construction is to ascertain and give effect to the intent of the legislature. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *People v. Jackson*, 2011 IL 110615, ¶ 12. We view the statute as a whole, construing words and phrases in connection with other relevant statutory provisions rather than in isolation, while giving each word, clause, and sentence of a statute a reasonable meaning, if possible, and not rendering any term superfluous. *People v. Gutman*, 2011 IL 110338, ¶ 12. "A reviewing court may also consider the underlying purpose of the statute's enactment, the evils sought to be remedied, and the consequences of construing the statute in one manner versus another." *People v. Garcia*, 241 Ill. 2d 416, 421 (2011).

¶ 62    Section 5 of the Act defines a " '[c]laim of torture' " as meaning

"a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture." 775 ILCS 40/5(1) (West 2018).

By requiring that such events "occurr[ed] within a county of more than 3,000,000 inhabitants," the provision only applies to Cook County. *Id.*

¶ 63    The State focuses on language from this definition, asserting that a "claim of torture" therefore requires that a petitioner (1) must have been "tortured" (2) "into confessing to the crime for which the person was convicted" and (3) that "the tortured confession was used to obtain the conviction." We note the definition also includes the additional provision "and for which there is some credible evidence related to allegations of torture." See *id.*

¶ 64    Section 10 declares that the Act's purpose is to establish "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." *Id.* § 10.

¶ 65    Section 40 explains, among other things, that the Commission has discretion on whether "to grant a formal inquiry" on a "claim of torture." *Id.* § 40(a).

¶ 66    Next, section 45 ("Commission proceedings") provides that where the Commission conducts a formal inquiry on a claim, which may in its discretion involve hearings, the Commission will then vote on whether "there is *sufficient evidence of torture* to merit judicial review." (Emphasis added.) *Id.* § 45(c). It states that, where a majority of the Commission concludes this threshold is met by a preponderance of the evidence, "the case shall be referred" to the chief judge of the Cook County circuit court. *Id.*

¶ 67    Finally, section 50 ("Post-commission judicial review") provides the following broad language:

> "(a) If the Commission concludes there is *sufficient evidence of torture to merit judicial review*, the Chair of the Commission shall request the Chief Judge of the Circuit Court of Cook County for assignment to a trial judge *for consideration*. The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing. Notwithstanding the status of any other postconviction proceedings relating to the petitioner, if the court *finds in favor of the petitioner*, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to

- 17 -

rearraignment, retrial, custody, bail or discharge, or for such relief as may be granted under a petition for a certificate of innocence, as may be necessary and proper." (Emphases added.) *Id.* § 50(a).

While an initial formal inquiry before the Commission is not adversarial in nature, section 50 provides that, in cases referred for judicial review, the state's attorney or a designee "shall represent the State at the hearing." *Id.* § 50(b); see also *id.* § 45(c) (providing that the State be served with notice of Commission proceedings only after the Commission has issued a decision).

¶ 68 Section 50 allows circuit courts to afford successful petitioners essentially unlimited remedies "with respect to" a petitioner's "judgment or sentence in the former proceedings," including orders for retrial, discharge, or to issue a certificate of innocence. *Id.* § 50(a). Nevertheless, it says little about what standards a circuit court should apply to the hearing itself, beyond stating that the Commission will request assignment of a referred case to the circuit court "for consideration" and authorizing relief only if "the court finds in favor of the petitioner." *Id.*

¶ 69 The State asserts that we should read the definition of "claim of torture" into section 50, which does not use that phrase, arguing that the question presented to a circuit court is whether a petitioner has proven his or her claim of torture. In other words, the State asserts that a petitioner must prove before the circuit court that (1) torture occurred, (2) the petitioner was tortured into confessing, and (3) the confession was used to obtain a felony conviction. Petitioner asserts the State wrongly conflates unrelated sections of the Act.

¶ 70 We note neither section 50 ("Post-commission judicial review") nor section 45 ("Commission proceedings") uses the phrase "claim of torture." As we have explained, section 40—which does use the phrase "claim of torture"—provides that the Commission has discretion on "whether to grant a formal inquiry regarding *** [a] claim of torture." *Id.* § 40(a). Sections 45 and 50 both use the phrase "sufficient evidence *of torture* to merit judicial review," while section 45 states "*the case* shall be referred" to the circuit court on a majority vote of the Commission and section 50 states a Commission referral requests assignment to a circuit court "for *consideration*." (Emphases added.) See *id.* §§ 45(c), 50(a). Petitioner asserts this language shows the *entire case* is referred for general consideration by the circuit

court, once the Commission determines credible evidence of torture has been presented.

¶ 71 But the State also points to section 10, noting that the purpose of the Act is ultimately to establish "an extraordinary procedure to investigate and determine factual *claims of torture* related to allegations of torture." (Emphasis added.) See *id.* § 10. The State argues that the Act contemplates a circuit court making the ultimate determination on whether factual claims of torture are proven, after the Commission has initially determined that a claim's allegations presented some credible evidence of torture and, therefore, referred the case for judicial review.

¶ 72 All of this brings us to the question of what constitutes "torture." The parties agree the Act contains no definition of "torture" but note the Commission has promulgated an administrative rule defining the term as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for the purpose of obtaining from that person a confession to a crime." 20 Ill. Adm. Code 2000.10 (2017). Merriam-Webster defines "torture" to mean (1) "the infliction of intense pain (as from burning, crushing, or wounding) to punish, coerce, or afford sadistic pleasure" or (2)(a) "something that causes agony or pain" or (b) "anguish of body or mind." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/torture (last visited Jan. 8, 2024) [https://perma.cc/5ZXC-E79S].

¶ 73 We conclude the language used in the Commission's definition, focusing on acts intended to inflict "severe pain or suffering, whether physical or mental," aligns well with the dictionary definitions, which similarly focus on the "infliction of intense pain," "agony," or "anguish of body or mind." Importantly, we note both types of definitions allow torture to stem from acts of abuse that are not physical in nature—that is to say, torture can result, in whole or part, from the intentional infliction of severe *mental* pain or suffering, or anguish *of mind*.

¶ 74 The parties also rely on appellate court case law. In *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 136, the appellate court concluded that the evidence a petitioner can present under the Act should be no more limited than the evidence that may be presented under the Postconviction Act, as the legislature did not intend to create "a remedy that was *harder* to secure than what [victims of police torture] already had." (Emphasis in original.) See also *id.* ¶ 138 (holding that "judicial

review of a [Commission] claim is a type of 'postconviction hearing' within the meaning of Rule 1101(b)(3)" (see Ill. R. Evid. 1101(b)(3) (amended Apr. 8, 2013)) and therefore the "Illinois Rules of Evidence do not apply" therein).

¶ 75 In *Wilson*, 2019 IL App (1st) 181486, ¶ 52, the appellate court noted that under the Postconviction Act an evidentiary hearing "is not intended to decide the ultimate issue of whether the petitioner's confession was coerced" but instead initially requires a petitioner show "only that newly discovered evidence *would likely have* altered the result of a suppression hearing." (Emphasis in original.) The court explained it believed the "legislature clearly did not create a new form of postconviction relief with the intent that a petitioner satisfy a heavier burden than that imposed by the Post-Conviction Act." *Id.* Based on "the similarities between evidentiary hearings under the Post-Conviction Act and the Torture Act," it determined that "a petitioner's initial burden under the Torture Act is the same." *Id.*

¶ 76 In *Whirl*, 2015 IL App (1st) 111483, ¶ 51, the appellate court noted the State "conceded that the judicial review contemplated under the Torture Inquiry Act is akin to a third-stage evidentiary hearing under the Postconviction Act." Whirl filed a combined petition raising similar claims under the Postconviction Act and the Act, and the circuit court held one evidentiary hearing that addressed both claims. *Id.* ¶¶ 50-52. However, the appellate court ultimately concluded that, because it determined Whirl was "entitled to a new suppression hearing under the Postconviction Act, we need not address [his] claim for the identical relief under the Torture Inquiry Act." *Id.* ¶ 111.

¶ 77 The appellate court in *Christian*, 2016 IL App (1st) 140030, ¶ 95, affirmed the circuit court's denial of a claim referred under the Act for judicial review, noting that, "while the Commission is asked to determine whether there is enough evidence of torture to merit judicial review, the circuit court is asked to determine whether defendant has been tortured." See also *id.* ¶ 96 (concluding that "the Commission's decision did not relieve defendant of the burden of proving before the circuit court that he had been tortured"). Similarly, the appellate court stated the following in *People v. Johnson*, 2022 IL App (1st) 201371, ¶ 76:

"[W]e recognize that [the Commission]'s role is not to determine whether torture *actually occurred*. *** [W]e hold that, upon referral from the [Commission], the circuit court should proceed to hold an evidentiary hearing

***. Then, based on the evidence adduced at the evidentiary hearing, the circuit court can independently make factual findings as to whether torture actually occurred." (Emphasis in original.).

¶ 78 The State relies on the descriptions in *Christian* and *Johnson* of judicial review under the Act as requiring a determination on whether torture actually occurred. Petitioner responds that Illinois courts have sometimes used the words "torture" and "coercion" interchangeably in this context, advocating for the voluntariness burden-shifting standard adopted by analogy in *Wilson*.

¶ 79 Ultimately, we conclude that the plain language of the Act requires the circuit court to determine whether a petitioner has shown by a preponderance of the evidence that (1) torture occurred and (2) resulted in a confession that was (3) used to obtain a conviction, not to assess the voluntariness of statements or other constitutional claims that can be raised in a postconviction petition. To the extent a court answers these questions in the affirmative, the Act provides the court with wide-ranging authority to craft an appropriate remedy to root out and ameliorate the effects of the tortured confession. We thus overrule *Wilson*, 2019 IL App (1st) 181486, ¶ 52, which adopted a contrary standard.

¶ 80 As to how we review the decision of the circuit court, we apply the manifestly erroneous standard. See *Coleman*, 183 Ill. 2d at 385. This court will find a circuit court's decision is manifestly erroneous where it contains an error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). This standard of review is based on "the understanding that the postconviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *Coleman*, 183 Ill. 2d at 384 (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)).

¶ 81 We note petitioner cites a variety of cases that directly analyze the voluntariness of statements. For the reasons stated, we find those cases inapplicable here. Petitioner also moved for leave to cite additional authority, which we allowed, referencing our recent opinion in *People v. Washington*, 2023 IL 127952. In *Washington*, we recognized that the certificate of innocence statute, section 2-702 of the Code of Civil Procedure (735 ILCS 5/2-702 (West 2016)), is remedial in

nature and explained that courts construing it must therefore "employ[ ] a broad interpretation to further the purposes of the statute" rather than "defeat the legislative intent by imposing a technical legal obstacle." (Internal quotation marks omitted.) *Washington*, 2023 IL 127952, ¶ 31. We agree that the Act is also remedial in nature, and it too must be broadly interpreted to further its purpose of establishing "an extraordinary procedure to investigate and determine factual claims of torture." 775 ILCS 40/10 (West 2018). In doing so, we conclude that the Act is specifically concerned with torture, not the voluntariness of statements in general.

¶ 82      We recognize petitioner's argument suggesting the Act should apply to any unlawful act of physical violence by the police—not a higher showing of torture—to qualify for relief. Petitioner raises the concern that a court confronted with allegations of some lesser act of police abuse against a defendant could "nevertheless deny relief because the violence was not creative or egregious enough, in the court's mind, to be dubbed torture," potentially leading to "profoundly unfair results." While we do not countenance any unlawful physical violence being committed against those in police custody, we note there are other ways to challenge such conduct. See, *e.g.*, *People v. Wrice*, 2012 IL 111860, ¶ 84 (holding that the "use of a defendant's physically coerced confession as substantive evidence of his guilt is never harmless error"). In creating the Act, the legislature chose to address the serious problem of Chicago police torturing suspects into confessing, not acts of physical abuse by the police in general. We are bound to follow the plain language of the Act.

¶ 83                      B. Whether Judicial Review Under the Act Requires
Consideration of the Totality of the Circumstances,
Including Alleged Acts That Might Not
Alone Be Torture

¶ 84      Petitioner initially argues the appellate court erred by excluding from its consideration the totality of the circumstances—including the effect of allegations of additional constitutional violations that would not by themselves support a freestanding claim of torture under the Act. Petitioner asserts that courts reviewing cases referred under the Act are not limited to considering only acts of physical abuse in a strict vacuum, given the Act's broad plain language. Instead, petitioner

argues that courts need to look at the totality of the circumstances in evaluating a claim of torture. We agree.

¶ 85    Petitioner asserts the appellate court erred by considering his allegations of initial physical violence in isolation, while excluding from the analysis allegations of a variety of other troubling constitutional violations that followed, leading up to him giving oral and written statements.

¶ 86    The State does not defend the appellate court's approach, arguing only that this court should affirm because it believes the circuit court did not manifestly err by holding that petitioner did not prove his claim of torture, where it found petitioner's allegations were not credible. The State concedes that "the inquiry into whether a person was tortured, like the inquiry into whether a person was coerced, is a fact-specific inquiry that considers the totality of the circumstances." We accept the State's concession.

¶ 87    Petitioner also relies by analogy on our statement in *Washington* that review on the separate issue of whether a defendant's statement was voluntary under the certificate of innocence statute "should be made considering the totality of the circumstances on a case-by-case basis *in light of the remedial purpose of the statute*." (Emphasis added.) *Washington*, 2023 IL 127952, ¶ 42. Although we have determined that the voluntariness of statements is not at issue under the Act, we otherwise agree that courts applying the Act should weigh the totality of the circumstances on a case-by-case basis when considering a referred claim of torture, and we further agree that this inquiry should be conducted in light of the remedial purpose and relevant history behind the Act.

¶ 88    A court analyzing whether a petitioner has shown torture occurred by a preponderance of the evidence must consider the totality of the circumstances, including any alleged violations that would not necessarily qualify as torture if viewed alone. We emphasize that police treatment of a petitioner must be sufficiently extreme to qualify as torture under the Act, but this threshold can be satisfied by a combination of different kinds of acts and omissions—including alleged mental as well as physical abuse—that cumulatively constitutes torture. When engaging in this inquiry, courts should be mindful of the history of police torture in Chicago that led to the legislature's creation of the Act and its remedial purposes to identify victims and ameliorate the effects of those practices by

"establish[ing] an extraordinary procedure to investigate and determine factual claims of torture." 775 ILCS 40/10 (West 2018). We therefore apply those principles to the case at hand.

¶ 89                    C. Whether the Circuit Court Manifestly Erred by
                                  Denying Petitioner's Claim

¶ 90        Although petitioner argues under a voluntariness standard, which we have declined to adopt, he ultimately asserts that he showed by a preponderance of the evidence that torture occurred here and that the circuit court erred by rejecting his claim of torture under the Act. The State argues that the circuit court's denial of petitioner's claim should be upheld where it determined in its role as the fact finder that petitioner was simply not credible and that Mebane was credible. We conclude that the circuit court did not manifestly err by denying petitioner's claim.

¶ 91        During the hearing that followed referral by the Commission, petitioner testified an unnamed police detective kicked him once in the shin while wearing cowboy boots, causing excruciating pain, then tried to kick him "numerous" more times, causing glancing blows. He alleged this detective also got in his face, screaming at him, and threatened to shoot him. Petitioner has long raised allegations of physical abuse against an unnamed short, white police detective who kicked him in the leg early in his interrogation at Area 2. However, the circuit court found significant the inconsistencies over time between petitioner's allegations of abuse.

¶ 92        To rebut petitioner's allegations of physical abuse, the State draws a contrast between petitioner's testimony that he was wearing shorts and bleeding from where his "flesh was scraped off the bone part of [his] lower knee" and Mebane's testimony that petitioner looked fine when he saw him and the circuit court's finding that Mebane was "extremely" credible. The circuit court also found petitioner to be a "wholly incredible witness," specifically noting petitioner lacked credibility in his in-court description of the attack and his injury, as well as in his live demonstration of attempts to dodge and block "numerous" additional kicks from his assailant.

¶ 93        Petitioner stated he did not know the name of the detective from 1998 through his Commission interview in 2012 but then learned it sometime prior to his

- 24 -

evidentiary hearing in 2019. Petitioner explained that he connected his allegations to McDermott after reviewing police reports and looking at pictures of Area 2 detectives with other inmates, whose names petitioner could not recall, ultimately identifying McDermott from a picture in a newspaper article on the Burge trial. The State does not dispute that McDermott initially interrogated petitioner in this case. And petitioner relies extensively on the wealth of pattern and practice evidence he submitted against McDermott. However, the circuit court specifically determined that petitioner lacked credibility in his in-court explanation of how he eventually connected his allegations to McDermott, calling this testimony "troubling" and outlining why it found the other evidence against McDermott "of little relevance."

¶ 94    Petitioner also testified that the stress of his time in custody caused his asthma condition to flare up until it felt like his airways were closing and that he struggled to breathe and also experienced hives on his skin around the handcuff on his wrist. Before the circuit court, the State conceded that petitioner suffered from asthma at the time of the events at issue, disputing only the severity of his symptoms. However, the court found Mebane's trial testimony regarding petitioner's physical condition credible, including that petitioner looked fine and told Mebane he had been treated well. Also, the State points to an Area 2 document stating that petitioner claimed to take medication for asthma but declined "any treatment at this time." The State also emphasizes petitioner's testimony that he may not have received medical care during his initial processing at the Cook County jail after the interrogation but instead may have received it later on after being assigned to a cell block.

¶ 95    Petitioner additionally testified that the police denied his repeated requests for a lawyer, leading him to believe no rules applied, and that he had no sleep or food for more than 30 hours, until he began cooperating. Petitioner asserts that these additional allegations are unrebutted by the record. See *Washington*, 2023 IL 127952, ¶ 58 ("The unrebutted evidence establishes police abuse, and the lower courts were not free to ignore it."). Thus, as we instructed, we consider this allegation along with the other allegations made by petitioner.

¶ 96    As we have explained, the question for the circuit court to answer in this case was whether petitioner showed by a preponderance of the evidence that under the totality of the circumstances the combination of acts alleged here were sufficiently

severe to constitute torture—conduct "by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for the purpose of obtaining from that person a confession to a crime." 20 Ill. Adm. Code 2000.10 (2017). In turn, we must now determine whether the circuit court manifestly erred by answering that question in the negative. We conclude it did not, where the contrary result is not "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Morgan*, 212 Ill. 2d at 155.

¶ 97        In reaching this conclusion, we emphasize the circuit court's credibility determinations as the fact finder at the evidentiary hearing. Here, the circuit court was "able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *Coleman*, 183 Ill. 2d at 384 (quoting *Fulkerson*, 12 Ill. 2d at 75). We reaffirm the long-standing principle that the finder of fact is generally the best judge of credibility and such determinations will not be overturned on appeal absent manifest error. In its role as fact finder, the circuit court heard live testimony and, considering it together with other evidence presented at the hearing and appearing in the record, determined that petitioner was a "wholly incredible witness," while Mebane was "extremely" credible. We note the circuit court specifically found petitioner was not credible in testifying about the alleged attack itself, including his live demonstration of attempts to evade it and on his process of belatedly connecting the allegations to McDermott. We will not disturb those findings on the record presented.

¶ 98                                    III. CONCLUSION

¶ 99        For the foregoing reasons, we affirm the judgment of the appellate court on other grounds and affirm the judgment of the circuit court.

¶ 100        Judgments affirmed.

¶ 101    JUSTICE NEVILLE, dissenting:

¶ 102    In this case, *Darrell Fair* testified at a torture evidentiary hearing that Detectives Ted Przepiora, Al Brown, Maverick Porter, and Michael McDermott interrogated and tortured him—deprived him of medicine, food, sleep, and an attorney for 30 hours. The detectives did not testify at Fair's torture hearing or at any other proceeding where they contradicted or rebutted Fair's claims of torture. It is axiomatic that testimony by a witness cannot be disregarded or ignored by a court when it is neither contradicted, improbable, nor impeached. *Fair's unimpeached, uncontradicted, probable testimony* was disregarded and ignored but found incredible by the circuit court, and that finding has been affirmed by the majority. Mebane, the assistant state's attorney found credible by the circuit court, with the finding being affirmed by the majority, is an incompetent witness (1) because he was not present during Fair's 30 hours of interrogation and, therefore, has no personal knowledge of what transpired during Fair's interrogation and, (2) because he has not been qualified as a doctor, he can only, as a layperson, testify about how Fair looked and cannot express an opinion on Fair's physical condition and whether he had been deprived of food, medicine, or sleep for 30 hours. The circuit court committed a manifest error by disregarding and ignoring Fair's unimpeached and unrebutted testimony and by relying on the incompetent testimony of Mebane. Accordingly, because the majority affirms the circuit court's findings, which constitute manifest errors, I respectfully dissent.

¶ 103    While I dissent, I agree with the majority's determination that a court analyzing a claim of torture referred for review under the Torture Inquiry and Relief Commission Act (Act) (775 ILCS 40/1 *et seq.* (West 2018)) must consider the totality of the circumstances, including any allegations of constitutional violations that would not, by themselves, support a freestanding claim of torture under the Act. *Supra* ¶ 84. I also agree that, in reviewing a torture claim upon referral from the Commission, the circuit court must consider the totality of the circumstances occurring in connection with a claim that a petitioner has been tortured into confessing. *Supra* ¶ 84.

¶ 104    However, I must respectfully disagree with the majority's holding that the circuit court's finding that Fair's testimony was incredible was not against the manifest weight of the evidence and that he failed to prove his claim of torture.

*Supra* ¶ 97. I find, in applying the standard of totality of the circumstances, that Fair's testimony that the police interrogators engaged in multiple unconstitutional acts—depriving him of sleep, medication, food, and counsel for 30 hours—was unrebutted by the interrogating police officers and the aforementioned acts were sufficient, individually or in combination, to constitute torture. I also find that Fair's unrebutted testimony showed, by a preponderance of the evidence, that he was tortured, which resulted in his inculpatory confession being used to obtain his conviction. Therefore, the circuit court's finding—that Fair's unrebutted testimony was incredible—was against the manifest weight of the evidence, and a contrary result is clearly evident, plain, and indisputable. See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 105    I agree with the majority's observance of the long-standing principle that the finder of fact is generally the best judge of credibility and the factfinder's credibility determinations will not be overturned on appeal absent manifest error. *Supra* ¶ 97; *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). Here, there was manifest error in the circuit court's finding that Fair's uncontradicted and unrebutted testimony was not credible and that Fair was a "wholly incredible witness," while Mebane was "extremely" credible.

¶ 106                                I. BACKGROUND

¶ 107                             A. Fair's Interrogation

¶ 108    Fair was arrested, without a warrant, at 1:30 p.m. on September 1, 1998. Fair was presented to felony review prosecutor, Adrian Mebane, at 7 p.m. on September 2, 1998. Thus, the interrogation of Fair lasted approximately 30 hours. The detectives involved in the interrogation included Detective Ted Przepiora, Detective Al Brown, Detective Maverick Porter, and Detective Michael McDermott.

¶ 109                      B. Fair's Allegations of Torture

¶ 110          The Commission's referral found that, "by a preponderance of the evidence, there is sufficient evidence of torture to conclude the Claim is credible and merits judicial review for appropriate relief." *In re Claim of Fair*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.018-F, at 1 (2013), https://tirc.illinois.gov/content/ dam/soi/en/web/tirc/documents/decisions/Case%20Disposition%20Darrell%20 Fair.1.0.pdf [https://perma.cc/LNF2-UPXL]. Fair alleged torture (1) in a motion to suppress, (2) at his sentencing hearing, (3) in a postconviction petition, (4) in a *habeas corpus* petition, (5) at a Commission hearing, and (6) at a circuit court evidentiary hearing.

¶ 111                  1. Withdrawn Amended Motion to Suppress

¶ 112          On October 25, 2000, Fair filed an amended motion to suppress, stating a short, white officer with cowboy boots kicked him in the shins, the officers denied him asthma medicine and food, and the officers denied his requests for the assistance of counsel. On January 30, 2002, the motion was withdrawn on trial counsel's advice.

¶ 113                          2. Sentencing Hearing

¶ 114          On February 13, 2003, at Fair's sentencing hearing, he stated that during his interrogation he was chained to a wall, kicked and beaten repeatedly, denied the assistance of counsel, and received food only when he agreed to talk to Detective Porter. He also stated that the written statement was not signed because it was not factually accurate.

¶ 115                      3. Fair's Postconviction Petition

¶ 116          On July 28, 2005, Fair filed a *pro se* postconviction petition. Fair averred that he was chained to a metal ring on the wall and "a white detective about five-five and 130 to 140 pounds, wearing brown cowboy boots" entered the room and started kicking him in his lower left leg. That officer had his right hand resting on his holstered gun, and Fair "was in fear of being shot." After 20 minutes of verbal and physical abuse, he left. Thereafter, Detectives Brown and Porter arrived and

- 29 -

questioned Fair, and in the afternoon, he was given food in exchange for his cooperation. Fair requested but was denied legal representation by Przepiora, Brown, Porter, and McDermott. He was also denied medical treatment for severe asthma and a skin condition. Fair stated that "the oral as well as the written statements were not accurate descriptions of the facts as I knew them." Fair's petition was dismissed on August 22, 2005.

¶ 117                                4. *Habeas Corpus*

¶ 118      Fair, in 2011, filed for a writ of *habeas corpus* with the United States District Court for the Northern District of Illinois. The petition claimed, *inter alia*, that police used physical abuse to overcome his repeated refusals to answer questions. He was questioned after requesting counsel, and he was denied medical treatment, food, and sleep for more than 30 hours. The petition was denied. *United States ex rel. Fair v. Hardy*, No. 10 C 7710, 2011 WL 1465532 (ND. Ill. Apr. 18, 2011).

¶ 119            5. Illinois Torture Inquiry and Relief Commission Hearing

¶ 120      On May 25, 2011, Fair filed a claim of torture with the Commission, alleging that he was kicked in the lower leg, was threatened with a gun and feared being shot, was kept awake, was denied asthma medication and food for a period of more than 30 hours, and was denied access to a lawyer. In Fair's June 1, 2012, recorded phone interview with the Commission staff, he stated that he suffered from asthma and severe skin allergies, and he gave a history of these conditions indicating that he had a prescription for albuterol and steroid inhalers. Fair stated that police officers, including Przepiora, arrested him at his mother's house and that he was threatened and told he would be shot if he did not open the door. When he was arrested, he was immediately handcuffed, and he asked that he be allowed to bring his asthma medicine to the police station, but the officers refused. He stated that the handcuffs triggered an allergic skin reaction and that he broke into hives around his wrists. He was taken to Area 2, where his asthma flared up, it was like breathing through a straw, and he believed that his symptoms were obvious to the detectives. At one point, an unidentified female African American assistant state's attorney came into the interrogation room and observed him "lying there wheezing." Fair stated that, while at Area 2, he asked everyone he came into contact with for his

medication but was denied treatment and was not provided with medication until after the interrogation, when he was processed through the jail and was examined at Cermak Health Services. He stated that he was then given inhalers for his asthma and Benadryl for his allergies.

¶ 121      Fair described an unnamed short, white officer with cowboy boots who shouted at him and called him a murderer and kicked him in the shin one time. After kicking Fair, the unnamed officer "rested his hand on [his] revolver" and told petitioner to "make a move" and give the detective a reason to shoot him. Fair recalled that the officer testified in a case in Markham that petitioner was charged with.

¶ 122      Fair was sleep deprived at Area 2 and testified that he was kept awake because, whenever he tried to lie down, someone would come in to question him. He also had trouble sleeping because of his asthma and because it was cold where he was being held. His requests for a lawyer were ignored or denied.

¶ 123      Porter came in and spoke to petitioner. Porter recounted what Fair allegedly did, and Fair denied these allegations. Fair was denied food until he agreed to cooperate, and in exchange for food he repeated what Porter told him to say to felony review prosecutor Mebane.

¶ 124                         6. Circuit Court Evidentiary Hearing

¶ 125      On April 29, 2019, an evidentiary hearing was held before the circuit court. Fair testified that when the police officers arrived to arrest him on September 1, 1998, at about 11:30 a.m., he had not yet eaten breakfast—his last meal prior to his arrest was dinner on August 31. When the officers pounded on his door, he asked to see a search warrant, and the officers threatened to shoot him through the door if he did not open it. The officers began kicking down the front door, and Fair opened the door and was immediately handcuffed and arrested. Fair told the officers he had chronic asthma and an allergic skin condition and asked them to let him bring his asthma inhaler with him to the police station, but the officers refused. Przepiora brought Fair to an Area 2 interrogation room and handcuffed his left arm to a ring

on the wall, and he sat on a metal bench. Fair asked the detective for his asthma medication and requested a lawyer, but Przepiora ignored both requests. Fair explained that stress exacerbates his asthma and that he was struggling to breathe. He was also having an allergic reaction to the handcuffs and breaking out in hives and welts.

¶ 126    While Fair was handcuffed in the interrogation room, a white detective who was about "five-five, five-six, maybe 130 to 140 pounds and wearing cowboy boots" entered. Fair identified a photograph of Detective Michael McDermott as this detective. McDermott was in a loud rage and used abusive language, and he kicked Fair under the knee so hard that it "felt like an explosion." McDermott stepped back, put his hand on his gun, and threatened Fair, stating, "Go for it. Give me a fucking reason, go for it, make a move, go for it. I'll shoot your ass right here." McDermott repeatedly tried to kick Fair in the legs, but after the first solid kick, Fair deflected by covering his legs and dodging direct blows, with his free arm. Fair was bleeding, and the skin was scraped off his lower leg. McDermott swore and called petitioner names during the attack. McDermott eventually left.

¶ 127    A couple of hours later, Przepiora returned and was told about the abuse, and again Fair asked for his medications and a lawyer. Przepiora uncuffed him from the wall but otherwise provided no assistance. Przepiora returned several more times to question Fair, who again asked for a lawyer. At one point, Fair saw through the window in the door of the interrogation room that Przepiora was right outside speaking to Officer Martin Smith. Fair knew Smith because they attended Catholic school together, and Fair kicked on the door to get Officer Smith's attention and yelled that he wanted a lawyer. In response, Przepiora returned and cuffed Fair to the ring on the wall.

¶ 128    Several hours later, McDermott returned with a handful of files and made accusations against Fair but did not attempt to strike Fair. Later that evening, Porter entered, left, and returned several times and told Fair that they had evidence that he was involved in the murder and Fair needed to help himself. Fair told Porter about McDermott's abuse and asked again for his asthma medications and for an attorney. Porter ignored him and continued to talk about the murder.

¶ 129    Fair was unable to sleep that night or at any time while at Area 2, from 1:30 p.m. on September 1 until 7 p.m. on September 2, 1998. The lights were on all

night, his arm was still handcuffed to the wall, and he had not eaten since the night before being arrested.

¶ 130    Porter returned with Brown multiple times over the next several hours to question Fair about the murder. Fair's breathing was continuing to get worse. At one point, Porter and Brown returned with a Black female prosecutor, and the prosecutor saw Fair was having difficulty breathing and was covered in welts and asked "what's wrong with him." Porter, Brown, and the prosecutor left.

¶ 131    Porter returned alone, and Fair asked for his asthma medications and for food, and Porter told Fair that he had to "give something to get something." Fair then told Porter that he had been in the parking lot of the bar at the time of the shooting and that he was trying to sell some bottles of alcohol; Porter then provided Fair with two burgers, fries, and a drink, the only food he received after more than 24 hours in custody.

¶ 132    Porter then started telling him what the police needed him to say, because the officers needed Fair's help against his codefendant. But they knew he had not done anything wrong, and he was not the target of their investigation. Porter said that if Fair repeated what they told him to say, he would be released.

¶ 133    Fair testified that he finally just agreed to do what Porter asked because he was in "survival mode," as he could not breathe without his asthma medications; he had been threatened with a gun, kicked, and deprived of food and sleep; and the officers were refusing his requests for an attorney. Fair stated he was scared and he simply did not know how much longer he could continue "to go on like that." Fair stated that "no regular rules that you think would apply in a police station was happening." The fact that the police were not following the rules made him believe that he had no option other than to do what the police were asking.

¶ 134    On cross-examination, Fair testified that he did not know the name of the white detective with cowboy boots at the time of submitting his torture claims. However, he determined that the officer who kicked him was McDermott after he saw a photograph of McDermott. Fair stated that, while in the prison library, one of the inmates had an article from a newspaper regarding encounters with detectives at Area 2, with pictures of Burge and other officers. Fair recognized McDermott's picture because he testified against him at a hearing in Markham. Finally, Fair

- 33 -

testified that he did not receive asthma medicine until four or five days after his arrest.

¶ 135        C. No Testimony From the Detectives in the Interrogation
Room Rebutting Fair's Torture Testimony

¶ 136        The record shows that Fair testified at the evidentiary hearing that during his interrogation the officers induced Fair's statement by (1) McDermott physically assaulting and threatening to shoot him; (2) the other officers ignoring Fair's request for counsel and by doing so depriving Fair of his right to counsel; and (3) all the officers depriving him of food, sleep, and necessary asthma medications for 30 hours.

¶ 137        Not one of the police officers who interrogated Fair testified at the evidentiary hearing and rebutted Fair's testimony that he was tortured during his 30 hours of interrogation. Instead, the State presented the testimony of Mebane, a felony review prosecutor who began taking Fair's oral statement on September 2, 1998, at 7 p.m., 30 hours after Fair's interrogation concluded. Then Mebane took a break after 30 minutes and 2 hours later, at 9:32 p.m. on September 2, 1998, resumed taking Fair's statement.

¶ 138        McDermott did not testify at trial or at the evidentiary hearing and has never refuted Fair's claims regarding his gun threat and physical assault. And neither Przepiora's nor Porter's trial testimony addressed the torture allegations against them, and they did not deny that they denied Fair food, sleep, medication, or counsel. Finally, felony review prosecutor Mebane admitted that he did not see what transpired during the first 30 hours of petitioner's interrogation.

¶ 139        D. Postinterrogation Testimony

¶ 140        1. Fair's Commission Testimony

¶ 141        During the interview with the Commission on June 1, 2012, Fair explained that on September 2, 1998, after 30 hours in the interrogation room and after receiving some food, he agreed to give a statement. Assistant State's Attorney Mebane then came in at 7 p.m., left and returned at 9:32 p.m., and then started "writing some

stuff down" and asked petitioner to sign the statement. Fair told Mebane that he wanted a lawyer, that he would not sign something that he did not do, and that he would not say anything. Mebane then printed Fair's name on the statement, near the waiver of rights, and told Fair to sign and initial it. Fair again refused.

¶ 142                        2. Fair's Evidentiary Hearing Testimony

¶ 143     At the circuit court's evidentiary hearing on April 29, 2019, Fair stated that he spoke to the felony review prosecutor, Mebane, and said what Porter had told him to say. Mebane wrote down Fair's statement, asking a few background questions. Then Porter and Fair had a back and forth while Mebane was "writing stuff down." Fair stated that Porter gave him an "outline" and that Fair added details to make it believable. Mebane presented Fair with the statement that he had drafted. After Fair read the statement, he believed that Mebane was trying to implicate him in the murder. Fair testified that he realized that Porter and Mebane were trying to charge him and his codefendant with the murder. Fair then told Mebane that he wanted to talk to a lawyer before signing anything. Fair refused to sign the statement. Fair testified that he agreed to give an oral statement because Porter told him he was not a target of the investigation, and he decided not to sign the written statement when he realized that he was a target.

¶ 144                              3. Mebane's Trial Testimony

¶ 145     Mebane testified at Fair's trial that on the evening of September 2, 1998, he arrived at Area 2 around 6 p.m. to investigate a murder. At around 7 p.m., he spoke with Porter, Brown, and Fair for about 30 to 40 minutes; at 7 p.m. Fair had been interrogated for approximately 30 hours. Mebane testified that he advised Fair of his constitutional rights. Mebane explained that Fair could have a statement written indicating that it was a "back and forth" conversation. Mebane testified that Porter left the room and that Mebane asked Fair how he had been treated; Fair responded that he had been treated "good" by everyone. Mebane asked Fair if there had been any threats or promises in exchange for his statement, to which Fair said "no." Mebane stopped taking Fair's statement at 7:30 p.m. and left to interview another witness to the crime.

¶ 146    Mebane and Porter returned to the interrogation room at 9:32 p.m. and resumed taking Fair's written statement, 32 hours after Fair's interrogation began. Mebane testified that Fair's "Constitutional rights" were typed on the first page of the statement and Fair's name was printed below by Mebane. Mebane wrote down what Fair had previously said, asking for details as they went. When Fair verbally made changes, Mebane wrote and then initialed the changes. Fair declined to initial the changes without a lawyer present. Mebane continued writing the statement and reviewing the same with Fair. Mebane signed the statement, but Fair again declined to sign without legal representation.

¶ 147                    4. Mebane's Evidentiary Hearing Testimony

¶ 148    At the evidentiary hearing in the circuit court, Mebane testified to his general practices of interviewing a suspect. Mebane stated that he would Mirandize suspects before taking their statements and then immediately have the suspect sign the waiver form prior to proceeding with the statement. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Next, Mebane printed the person's name under the waiver and then asked the suspect if he or she wanted to sign the statement. If changes were made to the statement, Mebane would print his initials next to the change, and he would also ask the suspect to initial the change to the statement.

¶ 149    Mebane testified that he did not observe all of Fair's interrogation. Fair's interrogation began on September 1, 1998, at 1:30 p.m. Mebane arrived at the Area 2 police station interrogation room at 7 p.m. on September 2, 1998, and had a discussion with Fair for 30 to 40 minutes. Mebane left and returned at 9:32 p.m. to begin taking the written statement. He also testified that he did not have any independent recollection of this case, aside from the written statement. Mebane did not remember whether he explored Fair's treatment by the police or the reason for his lengthy detention. The written statement indicated that he had been given a burger, fries, and a drink, but Mebane was not concerned about that being the only food Fair received during 32 hours of confinement.

¶ 150    Mebane admitted that in 33 of the other custodial statements he had drafted as a felony review prosecutor, the statements documented that the suspect had been treated well by the police. In the statement Mebane drafted for Fair, however, he wrote that Fair was treated well by the prosecutor but omitted confirmation that he

was treated well by police. Mebane recalled that Porter was present during the handwritten statement, and although Mebane usually would have the officer present initial and sign the statement, he did not know why Porter did not sign the statement or initial any changes. He also recalled that Fair would not sign anything without a lawyer.

¶ 151    On cross-examination, Mebane denied fabricating the statement. Mebane stated that Fair did not appear to be in distress or having difficulty breathing, and Fair did not ask for any medication or medical attention. Mebane also did not recall any injuries to Fair.

¶ 152                                II. ANALYSIS

¶ 153                            A. Standard of Review

¶ 154    Here, the circuit court held an evidentiary hearing on a Commission referral, and the circuit court was required to consider new evidence and weigh the credibility of the witnesses. A reviewing court will disturb the circuit court's findings only if they are manifestly erroneous. Manifest error is error that is " ' "clearly evident, plain, and indisputable." ' " *Morgan*, 212 Ill. 2d at 155 (quoting *People v. Johnson*, 206 Ill. 2d 348, 360 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)). I agree with the majority that a reviewing court should not disturb the findings of the trial court unless the same are manifestly erroneous. *Supra* ¶ 97; see *Coleman*, 183 Ill. 2d at 386; *People v. Stanley*, 50 Ill. 2d 320, 322 (1972). Thus, a circuit court's decision is manifestly erroneous if it contains an error that is clearly evident, plain, and indisputable. *Morgan*, 212 Ill. 2d at 155; *People v. Christian*, 2016 IL App (1st) 140030, ¶ 106.

¶ 155                        B. Fair's Testimony Was Credible

¶ 156    Fair, for more than 20 years (September 1998 until April 2019), consistently claimed that he was interrogated and tortured by several police officers (1) in a motion to suppress, (2) at his sentencing hearing, (3) in his postconviction petition, (4) in a *habeas corpus* petition, (5) at a Commission hearing, and (6) at a circuit court evidentiary hearing. Fair also consistently testified that (1) he was arrested

and placed in handcuffs; (2) he was handcuffed to a wall and deprived of asthma medication, food, sleep, and counsel by his interrogators at an Area 2 police station; (3) he was threatened with a gun and kicked in the shin by McDermott; (4) the torture (deprivation of food, medicine, sleep, and counsel) persisted from September 1, 1998, at 1:30 p.m. until September 2, 1998, at 7 p.m.; (5) Fair then made an inculpatory oral statement to Porter; and (6) he had repeatedly invoked his *Miranda* rights, which the police officers ignored.

¶ 157    Fair's testimony was not contradicted or rebutted by any of the police interrogators who entered, left, and returned to the interrogation room at Area 2 for 30 hours. Mebane, who was not present in the interrogation room during Fair's interrogation and arrived at the interrogation room at 7 p.m., once the approximately 30 hours of interrogation concluded, had no personal knowledge of what had occurred in that interrogation room. Therefore, Mebane's testimony cannot rebut Fair's testimony.

¶ 158    While I agree that the credibility of witnesses and the weight to be accorded their testimony are typically jury considerations (*People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981) (citing *Mizowek v. De Franco*, 64 Ill. 2d 303, 309-10 (1976), and *Finley v. New York Central R.R. Co.*, 19 Ill. 2d 428, 436 (1960))), a jury or judge cannot arbitrarily or capriciously reject the testimony of an unimpeached witness (*id.* (citing *Larson v. Glos*, 235 Ill. 584, 587 (1908), and 81 Am. Jur. 2d *Witnesses* § 660, at 662-63 (1976))). Where the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded even by a jury or judge. *Id.* (citing *Larson*, 235 Ill. at 587, and *Urban v. Industrial Comm'n*, 34 Ill. 2d 159, 163 (1966)).

¶ 159    I would find that Fair's evidentiary hearing testimony, which stands unrebutted and unimpeached by the police interrogators, was neither incredible nor improbable but consistent and credible. Accordingly, I would hold that the circuit court's finding that Fair's uncontradicted, unimpeached, unrebutted testimony was incredible was against the manifest weight of the evidence, as the opposite conclusion is clearly evident, plain, and indisputable. *Morgan*, 212 Ill. 2d at 155.

¶ 160                    C. Interrogator Michael McDermott Is a Torturer

¶ 161    Fair presented consistent, uncontradicted, and unrebutted testimony that McDermott threatened him and denied him food, sleep, medicine, and counsel, which resulted in his inculpatory confession. Fair presented consistent, unrebutted evidence that McDermott was acting in conformity with his pattern and practice, established in other cases, of torturing suspects and detainees. See *People v. Muhammad*, 2023 IL App (1st) 220372, ¶¶ 11, 104; *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 56; *People v. Harris*, 2021 IL App (1st) 182172, ¶¶ 1, 6, 36; *People v. Smith*, 232 Ill. App. 3d 121, 125, 129 (1992); see also *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85 (determining that, as long as there is some evidence to support the complainant's allegations, a court may consider a party's refusal to testify as further evidence of the alleged misconduct in civil action).

¶ 162    I disagree with the circuit court's finding that other evidence against McDermott was "of little relevance," because the allegations were not similar to allegations in other cases and the allegations do not determine whether Fair proved his claim of torture. Instead, I agree with the appellate court that the circuit court erred in testing whether Fair's allegations of police misconduct were " 'strikingly similar' " to the misconduct shown in other cases. 2021 IL App (1st) 201072-U, ¶ 103. This court, in *People v. Jackson*, 2021 IL 124818, ¶¶ 33-34, clarified that the use of " 'strikingly similar' " in *People v. Patterson*, 192 Ill. 2d 93, 144-45 (2000), was merely descriptive of the allegations in that case and not a legal test for admissibility.

¶ 163    I also agree with the appellate court's finding that

> "[a]s early as the year 2000, petitioner has consistently alleged that McDermott kicked him in his leg. McDermott did not testify at his trial or at the evidentiary hearing, and the trial testimony of Detectives Przepiora and Porter did not rebut petitioner's allegations he was kicked by McDermott. Although we accord deference to the circuit court's resolution of conflicts in evidence and its determination on witness credibility, ' "the manifest weight standard is not a rubber stamp. It does not require mindless acceptance in the reviewing court." ' *Harris*, 2021 IL App (1st) 182172, ¶ 56 (quoting *People v. Anderson*, 303 Ill. App. 3d 1050, 1057 (1999)).

Contrary to the trial court, we accept petitioner's unrebutted and consistent claims of being kicked by McDermott as true." 2021 IL App (1st) 201072-U, ¶¶ 105-06.

¶ 164 Beginning in 2000, through 2019, Fair's testimony consistently described a short, white male, about 5 feet, 5 inches, to 5 feet, 6 inches tall, weighing about 130 to 140 pounds, and wearing cowboy boots as the interrogator who physically tortured him. No witness has ever rebutted the fact that Fair's testimony is an accurate description of McDermott, including the easily verifiable detail of him wearing cowboy boots. Fair did not remember McDermott's name, but his ability to identify McDermott is confirmed by the unrebutted fact that he witnessed McDermott testify at an earlier court hearing in Markham. I also do not find it incredible that inmates in a prison library would search for information regarding Area 2 detectives affiliated with Burge who coerced confessions out of suspects. The majority notes that the "State does not dispute that McDermott initially interrogated petitioner in this case." *Supra* ¶ 93. Thus, there is documented evidence that McDermott interrogated Fair. Therefore, I disagree with the circuit court's finding that Fair's testimony connecting his allegations to McDermott is "troubling." Rather, I find it consistent and highly credible. See *People ex rel. Brown*, 88 Ill. 2d at 85 (finding testimony rational, reasonably consistent, and certain).

¶ 165 Additionally, I find support in the Commission's conclusion that Fair had been consistent in making the claims of torture. In an amended motion to suppress his statement before trial, he claimed that he was questioned for 30 hours and kicked in the leg. The Commission further observed that, in his postconviction petition, Fair's affidavit alleged that while at Area 2 a detective wearing cowboy boots kicked him in the leg and that the detective rested his hand on his service weapon so that Fair feared being shot. The Commission determined, by a "preponderance of the evidence, there is sufficient evidence of torture to *** merit[ ] judicial review." *In re Claim of Fair*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.018-F, at 1; see 775 ILCS 40/45(c) (West 2018).

¶ 166 Illinois courts have consistently held that a pervasive pattern of criminal conduct by police officers is enough for courts to reconsider whether petitioner's confession was the result of torture. See *Patterson*, 192 Ill. 2d at 139-45; *People v.*

*King*, 192 Ill. 2d 189, 198-99 (2000); *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997)); *Mitchell*, 2012 IL App (1st) 100907, ¶ 62 (finding that the new evidence of McDermott's perjury probably would change the result of the motion to suppress petitioner's statements).

¶ 167    In fact, the circuit court of Cook County's criminal division appointed Special State's Attorney Edward Egan and Chief Deputy Special State's Attorney Robert Boyle to investigate Burge-era brutality allegations, and they released their report in July 2006. See Edward J. Egan & Robert D. Boyle, Report of the Special State's Attorney, at 3 (2006) https://www.aele.org/law/2006LROCT/chicagoreport.pdf [https://perma.cc/9LCQ-WKM5] (hereinafter SSA Report). The authors of the SSA Report found the torture allegations centered on police officers known as the " 'Midnight Crew.' " See Nw. Pritzker Sch. of L., A Report on the Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle to Fairly Investigate Police Torture in Chicago, at 4-5 (2007), https://wwws.law.northwestern.edu/legal clinic/macarthur/projects/police/documents/4_25_07finalspecpros.pdf [https:// perma.cc/498E-L32E]. The SSA Report identified five officers, one being Michael McDermott, accused in torture cases in which guilt could be proven beyond a reasonable doubt. See SSA Report, *supra*, at 16; 2 Ill. Adm. Code 3500.375(c)(1)(B) (2017) (formal inquiry includes whether the allegations involve officers formerly under Burge's supervision).

¶ 168    At Fair's evidentiary hearing, he presented extensive unrebutted evidence of McDermott's history of untruthfulness, including McDermott's own testimony in Burge's criminal trial about covering up Burge's abuses. See *United States v. Burge*, No. 08 CR 846, 2014 WL 201833, at *3 (N.D. Ill. Jan. 17, 2014); SSA Report, *supra*, at 275-90 (finding evidence beyond a reasonable doubt that McDermott committed perjury and obstruction of justice for testifying falsely). Fair also submitted unrebutted evidence of McDermott's own use of torture to coerce confessions in numerous other cases. The following shows the significant, lengthy, and substantiated history of torture complaints against McDermott, as well as findings and determinations of McDermott's custom and practice of physical and psychological torture.

¶ 169                          1. Appellate Court Decisions

¶ 170    Several appellate court decisions relate alarm regarding McDermott's torture. See *Muhammad*, 2023 IL App (1st) 220372, ¶¶ 11, 104 (alleging McDermott hit the defendant and denied him food and the use of a bathroom and finding that many Commission decisions concern alleged torture by McDermott); *Mitchell*, 2012 IL App (1st) 100907, ¶ 56 (describing McDermott as "an admitted perjurer" and citing the unreliability of his highly questionable trial testimony); *Harris*, 2021 IL App (1st) 182172, ¶¶ 1, 6, 36, (reversing denial of postconviction relief based, *inter alia*, on allegations that McDermott hit the suspect, threatened him with a gun, and ignored his request for counsel); *Smith*, 232 Ill. App. 3d at 125, 129 (judge's finding that the defendant was arrested solely as a pretext for obtaining an identification in a lineup and that the officers' conduct, including McDermott's, was flagrant).

¶ 171                              2. Commission Claims

¶ 172    Many Commission decisions concern alleged torture by McDermott. See *Search Results*, Torture Inquiry & Relief Comm'n, https://tirc.aem-int.illinois.gov/search.html?q=mcDermott&contentType=everything (last visited Jan. 10, 2024) [https://perma.cc/73N4-SVKM]; *Leach v. Department of Employment Security*, 2020 IL App (1st) 190299, ¶ 44 (finding information on websites and in public records is sufficiently reliable such that judicial notice may be taken). The following Commission claims of torture perpetrated by McDermott were all referred for judicial review: *In re Claim of Reavers*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2016.405-R, at 7-10 (2023), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/reavers-willie-stamped-determination-2016-405-r.pdf [https://perma.cc/QED5-BDDG] (claiming McDermott continually handcuffed him to the wall, used verbal threats, and choked him); *In re Claim of Johnson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2019.641-J, at 1-2 (2022), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/2022-11-16-t-johnson-determination-referral-approved-signed.pdf [https://perma.cc/F5K2-XZCD] (claiming McDermott denied him food and water, assaulted and punched him, refused his request for a lawyer, and made racist comments); *In re Claim of Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.014-A, at 8 (2015), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/May%202015%20Anderson%20Order.1.0.pdf [https://perma.cc/G6RU-J3HL] (claiming McDermott held a gun to his head and threatened to kill him and finding

Anderson's claim had been consistent since his motion to suppress and there were many other claims of misconduct against McDermott); *In re Claim of Reynolds*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2012.116-R, at 1-2 (2021), https://tirc. illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/Ebony%20 Reynolds%20Final%20Disposition-SIGNED.1.0.pdf [https://perma.cc/5DDJ-M4QE] (claiming McDermott punched him in the ribs and face, slapped him in the face, and refused his requests for an attorney and finding McDermott had lengthy, consistent, and substantiated histories of complaints against him); *In re Claim of Muhammad*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2014.256-M, at 12 (2018), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/ 7.18.2018%20Muhammad%20Disposition-STAMPED.1.0.pdf [https://perma.cc/ WF9E-W3L8] (claiming that he was handcuffed to the wall and denied food and use of the bathroom and that McDermott struck his ears when he would put his head down).

¶ 173    Although not referred for judicial review, a special order was entered in *In re Claim of Clopton*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2012.112-C, at 18 (2021), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/ 2021.04.22%20SIGNED%20DETERMINATION.1.0.pdf [https://perma.cc/7TZ7-HW2K] (claiming McDermott yelled at her, kicked her leg and chair, pulled her hair, and threatened her with the death penalty and finding that she was taken to the police station and sequestered with police for 38½ hours before she gave her court-reported statement—an extended period of time lending itself to a coercive environment). The Commission, in denying Ms. Clopton's torture claim, acknowledged Detective McDermott's extensive history of abuse complaints and negative credibility determinations by more than one court and issued a special order referring the determination and administrative record to the Cook County State's Attorney's Office and its conviction integrity unit for its consideration and review of whether relief was warranted under its requirement to refer evidence of professional misconduct or other wrongdoing pursuant to section 45(d) of the Act (775 ILCS 40/45(d) (West 2018)). *In re Claim of Clopton*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2012.112-C, at 21.

¶ 174    In addition, it should be noted that the State informed the circuit court that McDermott would not cooperate or attend the evidentiary hearing. The circuit court expressly found that "McDermott was uncooperative with the State's attempt to

serve him with a subpoena to testify; Mr. Fair made nine unsuccessful attempts to serve McDermott at his home; and Mr. Fair attempted to serve McDermott's counsel in another matter, but counsel refused to accept service on McDermott's behalf."

¶ 175    I maintain that where police officers, who are state agents, participated in an investigation and have relevant and pertinent information regarding a claim of torture and the State fails to present its former police officers as witnesses at the evidentiary hearing, courts cannot arbitrarily or capriciously reject Fair's testimony because his testimony has not been rebutted and he has not been impeached. *People ex rel. Brown*, 88 Ill. 2d at 85.

¶ 176    Further, Fair's claims of torture cannot be rebutted by Mebane, who arrived on September 2, 1998, at 7 p.m. and was not present nor involved in Fair's 30 hours of interrogation. Mebane arrived after Fair's interrogation concluded.

¶ 177    Mebane did not see or hear the police officers interrogating Fair because he arrived in the interrogation room on September 2, 1998, at 7 p.m., after Fair's interrogation concluded, left at 7:30 p.m. to interview another witness to the crime, and returned at 9:32 to take Fair's written statement. Therefore, he has no personal knowledge of what took place during Fair's interrogation. Accordingly, the circuit court manifestly erred when it found that Fair's testimony was rebutted by Mebane, who had no personal knowledge of what happened during Fair's interrogation.

¶ 178    Fair's testimony is not rebutted by the police officers who interrogated him or by Mebane who took Fair's statement. This court should reverse the appellate court's decision and hold that when a confession is obtained during a custodial detention in which a court finds that police officers engaged in acts which constitute torture—suspect was handcuffed to a wall for 30 hours; suspect was deprived of medicine, food, sleep, or assistance of counsel for more than 30 hours; suspect was threatened with acts of violence—the police officers have violated the suspect's constitutional and statutory rights. 2021 IL App (1st) 201072-U, ¶¶ 105-06; *Gibson*, 2018 IL App (1st) 162177, ¶ 108 (finding that, in the face of a credible allegation, an officer of the court is unwilling to assure the court that he and his colleagues did not physically coerce a confession, when he determines that a truthful answer could subject him to criminal liability, the court should take careful note).

¶ 179   I think this court should draw a negative inference from the police interrogators' refusal to come forward and rebut Fair's probative testimony delineating the officers' misconduct. See *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 332 (1997) ("It is 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them.' " (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)); see also *Gibson*, 2018 IL App (1st) 162177, ¶ 85 (determining that, in a civil action, the fifth amendment (U.S. Const., amend. V) does not forbid an adverse inference against a party who refuses to testify in response to probative evidence of alleged misconduct and finding that, as long as there is "some" evidence to support the complainant's allegations, a court may consider a party's refusal to testify as further evidence of the alleged misconduct); *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 70 (a court may consider a witness's refusal to testify as evidence of the alleged misconduct so long as some evidence supports the complainant's allegations); *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107 ("We recognize that although a court may draw a negative inference from a party's refusal to testify, it is not required to do so. Yet given that the State produced no evidence to rebut the evidence of torture and abuse by Pienta, we believe Pienta's invocation of his fifth amendment rights is significant and a negative inference should have been drawn. Instead, when discussing the evidence that was presented at the suppression hearing, the trial court mentioned in passing that Pienta had taken the fifth amendment at the evidentiary hearing, but appeared to give more weight to the fact that the original judge had not found Whirl credible at the suppression hearing than to the fact that Pienta refused to testify at the evidentiary hearing.").

¶ 180   The majority states that, in creating the Act, "the legislature chose to address the serious problem of Chicago police torturing suspects into confessing, not acts of physical abuse by the police in general." *Supra* ¶ 82. Although any police officer's act of physical violence should not be condoned, McDermott was specifically found to have perjured himself and to have perpetrated torture in numerous Commission decisions. See *Muhammad*, 2023 IL App (1st) 220372, ¶ 104; see also *Search Results*, Torture Inquiry & Relief Comm'n, https://tirc.aem-int.illinois.gov/search.html?q=mcDermott&contentType=everything (last visited Jan. 10, 2024) [https://perma.cc/73N4-SVKM].

¶ 181 Thus, McDermott had an extensive history of torture, and McDermott's torture of petitioner is the embodiment of the serious problem of Chicago police torturing suspects that the Act was intended to address. See 775 ILCS 40/35 (West 2018) (duties include conducting inquiries into claims of torture); *What Can the Commission Do*, Torture Inquiry & Relief Comm'n, https://tirc.illinois.gov/about-us.html#faq-whatcanthecommissiondo-faq_copy (last visited Feb. 13, 2024) [https://perma.cc/BC8W-337M] (determining that the "Commission is authorized by the Act to gather evidence about a claim of torture occurring in Cook County, and then determine whether there is sufficient credible evidence of torture to merit juridical review"); 2 Ill. Adm. Code 3500.375 (2017) (formal inquiry includes whether the allegations involve officers formerly under Burge's supervision); SSA Report, *supra*, at 3; see also 775 ILCS 40/5(1)) (West 2018) (defining claim of torture).

¶ 182 Given the totality of the circumstances, after taking judicial notice of McDermott's documented history of torturing suspects, coupled with the State's inability to serve McDermott with a subpoena in order to compel his appearance at the circuit court's evidentiary hearing and the fact that Fair's testimony is unrebutted, Fair established by a preponderance of the evidence his claims of torture where he consistently stated, over a period of 20 years, that he was deprived of food, sleep, medicine, and counsel, for more than 30 hours during a two-day period. See *People v. Salamon*, 2022 IL 125722, ¶ 83 (holding that use of physical abuse to coerce confessions from a suspect is prohibited because it is revolting to the sense of justice).

¶ 183                    D. Fair's Being Denied Food, Sleep, Medicine, and
                                   Counsel Is Torture

¶ 184 I maintain that the majority erred when it found that the circuit court did not manifestly err in finding that Fair's testimony failed to show, by a preponderance of the evidence, that under the totality of the circumstances the combination of acts by police officers were sufficiently severe to constitute torture. *Supra* ¶ 97. Fair testified—and the State offered no evidence to rebut Fair's testimony—that as long as he denied involvement in the murder, police kept him chained to a wall and denied him food, sleep, medicine, and assistance of counsel.

¶ 185 The State presented Mebane's postinterrogation testimony about what he observed on September 2 at about 7 p.m. after Fair's approximately 30 hours of interrogation, but there was no evidence from the police interrogators refuting Fair's allegations of torture suffered during the first 30 hours of interrogation, beginning on September 1 at 1:30 p.m. and continuing until 7 p.m. on September 2, 1998. The State conceded that petitioner suffered from asthma at the time of the interrogation, disputing only the severity of the symptoms. In addition, the State failed to refute petitioner's allegations that his right to counsel was repeatedly violated by the interrogators.

¶ 186 "Where ' "the confession [is] the product of an essentially free and unconstrained choice by its maker," ' ' "it may be used against him." ' " *Salamon*, 2022 IL 125722, ¶ 80 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). However, if the will of the defendant " ' "has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." ' " *Id.* (quoting *Schneckloth*, 412 U.S. at 225-26, quoting *Culombe*, 367 U.S. at 602). "The Supreme Court has long held that police officers' use of physical abuse to coerce confessions from a suspect is prohibited because it is 'revolting to the sense of justice' embodied in the Constitution." *Id.* ¶ 83 (quoting *Brown v. Mississippi*, 297 U.S. 278, 286 (1936)).

¶ 187 However, the United States Supreme Court also has proscribed more subtle forms of police coercion, including psychological pressure. See *Miranda v. Arizona*, 384 U.S. 436, 448 (1966) (holding that the modern practice of in-custody interrogation is psychologically rather than physically oriented); see also *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (recognizing that " 'coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.' " (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960))). Indeed, courts have long held that employing sleep and food deprivation tactics during questioning that continues hour after hour, and includes several officers, is a common technique to induce a tortured confession. *Ashcraft v. Tennessee*, 322 U.S. 143, 150 n.6 (1944) ("It has been known since 1500 at least that deprivation of sleep is the most effective torture and certain to produce any confession desired."). Courts have also concluded that sleep deprivation violates an individual's constitutional rights. See *Vance v. Rumsfeld*, 701 F.3d 193, 206 (7th

Cir. 2012) (Wood, J., concurring in the judgment) (including sleep and food deprivation in a list of government misconduct that must be acknowledged for what they are: torture).

¶ 188                              1. Food and Sleep Deprivation

¶ 189        The interrogating officers used sleep and food deprivation to torture Fair into giving a confession. Fair testified that he did not sleep at all while at Area 2, as the lights were on all night, he was handcuffed to the wall, and he was cold and hungry. Fair testified that Porter told him he would receive food only in exchange for information. Specifically, Porter said that petitioner had to "give something to get something."

¶ 190        Mebane admitted that he was aware that Fair had only received a hamburger, fries, and a drink during the more than 30 hours he was held in the interrogation room. Fair testified that his last meal prior to his arrest was dinner on August 31, 1998. Thus, Fair made a coerced inculpatory statement in exchange for a burger, fries, and a drink—the first food he received after 24 hours in custody and the only food received by petitioner during his 30 hours of interrogation. Compare *People v. House*, 141 Ill. 2d 323, 379 (1990) (reasoning that it is difficult to draw a bright line, but defendants *properly processed* and charged can be held in interview rooms for lengthy periods of time, although given a different set of circumstances the result might be different), with Black's Law Dictionary (11th ed. 2019) ("torture" defined as the "infliction of intense pain to the body or mind *** to extract a confession"; also termed "extraordinary interrogation technique" ("An unusual and extreme means of questioning a suspect or detainee to break down the person's resistance to answering, usu. by subjecting the person to pain or extreme discomfort or denying necessities such as sleep." *Id.*)). This case crossed the *House* line because Fair was handcuffed to a wall and deprived of food, sleep, medicine, and counsel for more than 30 hours.

¶ 191                              2. Medicine Deprivation

¶ 192        Similarly, courts have held that denying medical treatment, when used to coerce a statement, is never harmless error. *People v. Strickland*, 129 Ill. 2d 550, 557-59

(1989) (deprivation of needed medical care supports suppression); *People v. Wilson*, 116 Ill. 2d 29, 39-40 (1987). The interrogating officers tortured Fair by refusing to give him his asthma and allergy medications even when he was in respiratory distress. When arrested, Fair told the officers he suffered from asthma and a skin condition and asked them to bring his inhaler to the police station. The officers refused. Then, when Przepiora brought Fair to an interrogation room and handcuffed him to a ring on the wall, Fair again asked for his asthma medication and a lawyer. The officer ignored both requests. Fair continued to request medication throughout more than 30 hours in custody. Fair explained that stress exacerbated his asthma, and he was struggling to breathe. Continuous refusal to provide needed medical treatment constitutes torture. See *Strickland*, 129 Ill. 2d at 555-56.

¶ 193                            3. Deprivation of Assistance of Counsel

¶ 194          Finally, Fair's allegations that he was deprived of access to counsel in violation of his *Miranda* rights was critical to petitioner's torture claims. Petitioner testified that he invoked his right to counsel repeatedly, to Przepiora, McDermott, Brown, Porter, and a female prosecutor. That testimony stands unrebutted. None of the four officers or the female prosecutor has ever testified and rebutted Fair's testimony that he pleaded for an attorney. Further corroboration is the absence of Fair's signature on the *Miranda* waiver or on the written statement attributed to him, even though it was Mebane's practice to seek a signature waiver from suspects at the outset of taking a statement. It should be noted Officer Porter also did not sign Fair's statement. Thus, the unrefuted testimony of Fair's repeated invocation of his right to counsel was a form of torture. See Ill. Const. 1970, art. I, § 2 (no person shall be deprived of liberty without due process of law); *Miranda*, 384 U.S. at 476 ("Any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.").

¶ 195          Illinois courts regularly consider whether police officers complied with *Miranda* safeguards in determining whether a statement was voluntary, on the one

hand, or the result of torture, on the other. See *People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009) (totality-of-the-circumstances factors considered by courts include the presence of *Miranda* warnings). The appellate court has done the same in Commission cases. *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 63; *Gibson*, 2018 IL App (1st) 162177, ¶ 17 (torture claim rested in part on violation of *Miranda* rules). A police officer's failure to comply with *Miranda* safeguards, by declining to honor a request for counsel, conveys to a suspect that he or she is outside the protection of the law, thus increasing the probability that the suspect will be tortured into a confession.

¶ 196    Fair testified that the detectives' unresponsiveness to his requests for counsel made Fair feel as if he was in "survival mode" and he had no option other than to do what the police were asking. Fair testified that "no regular rules that you think would apply in a police station was happening." Once Fair expressed his right to speak with the police only through an attorney, the law required his interrogators to cease questioning until counsel was present. See *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that an accused, having expressed his desire to deal with police only through counsel, is not subject to further interrogation until counsel has been made available to him).

¶ 197    The State, in the face of Fair's credible allegations of torture, presented none of the police interrogators who had personal knowledge of what took place in the interrogation room to directly address petitioner's allegations of being denied food, sleep, medicine, and the assistance of counsel. In addition, McDermott, who perpetrated petitioner's physical torture, was involved and identified in other cases involving torture.

¶ 198    Finally, Fair's testimony and claims of torture at Area 2 are consistent with the SSA Report's findings that torture, as alleged by Fair, was systemic and methodical at Area 2. Here, Fair's claims of torture remained unrebutted, and the circuit court's finding that Fair failed, by a preponderance of the evidence, to show he was tortured was against the manifest weight of the evidence. See *People v. Wrice*, 2012 IL 111860, ¶ 70 (observing the deep-rooted feeling that the police must obey the law while enforcing the law); *Gibson*, 2018 IL App (1st) 162177, ¶ 106 (same).

¶ 199                        E. Felony Review Prosecutor Mebane's
                                  Testimony Was Not Credible

¶ 200        The majority gives significant weight to the circuit court's finding that felony review prosecutor Mebane was extremely credible. *Supra* ¶ 97. I disagree because Mebane, who was not in the interrogation room and did not see or hear what went on during Fair's interrogation, had no personal knowledge of what took place when Fair was interrogated, and Fair's unsigned statement drafted by Mebane conflicts with Mebane's testimony. It should also be noted (1) that Fair requested an attorney if Mebane wanted him to sign the statement, (2) that Mebane did not provide Fair with an attorney, and (3) that Mebane did not stop drafting the statement once Fair requested an attorney. See *Edwards*, 451 U.S. at 484-85. In my opinion, Mebane's failure to provide Fair with an attorney violated Fair's constitutional right to counsel.

¶ 201        Considering the interaction between Fair and Mebane, the Commission expressed concern regarding the circumstances surrounding Fair's statements. It specifically stated:

            "3. The product of this interrogation is a very troublesome statement written by the ASA, which is attached as Exhibit A. On the signature line on the first page to demonstrate the waiver of rights, the ASA printed DF's name; the waiver is not signed by DF. The ASA's 'explanation' makes no sense:

                Q. And who wrote Darrell Fair there?

                A. I wrote Darrel Fair there.

                Q. And why did you do that?

                A. That would have been his name and after we reviewed his statement if he had wished to sign he probably would have signed there indicating that he understood those rights.

            (Transcript of Proceedings dated January 9, 2003, at 24-25)

            The ASA's testimony is a non sequitur: it in no way explains why the ASA would print DF's name on the signature line.

4. In addition, none of the corrections, which the ASA claims were made at DF's request, are initialed by DF. The ASA's testimony on this issue, which is attached as Exhibit B, is again nonsensical and confusing. According to the ASA, he made the corrections requested by DF as they went along and the ASA initialed them at that point. But he did not ask DF to do the same. Then, for some unexplained reason, well into the statement at about page 3, for the first time he asked DF to begin to initial the corrections and DF refused. However, the ASA continued to make the corrections and initial them himself. This testimony begs a host of questions: Why would he not ask DF from the outset to initial the corrections as they went along, while the corrections were fresh in the minds of all? What caused him to suddenly decide approximately halfway into the statement that he wanted DF to start initialing them as well? Why did he not make some note of when DF was first asked to initial the corrections and refused, so that it's clear on the face of the statement what is taking place?

5. The statement handwritten by the ASA is not signed by DF. Neither DF's signature nor his initials appear on the statement. Only the ASA's signature and initials appear on it." *In re Claim of Fair*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.018-F, at 1-2.

¶ 202     The Commission determined that the police had a motive to coerce an inculpatory statement from Fair, as it specifically concluded that the "prosecution case against DF was practically non-existent without the statement, creating a powerful incentive to obtain the statement." *Id.* at 3. It further concluded that "DF has been consistent in making the Claim. The written motion to suppress asserts the asthma and kicking claims, and the post-conviction petition is completely consistent with the TIRC Claim." *Id.*

¶ 203     Furthermore, Fair's written unsigned statement drafted by Mebane contains two assertions that Fair would not sign the statement without assistance of counsel. In other words, Fair invoked his *Miranda* right to have counsel present, only to be denied the protections guaranteed by *Miranda*. See *Miranda*, 384 U.S. at 467 (concerned with interrogation that takes place in a police-dominated environment containing "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely").

¶ 204    I find that Mebane's testimony that Fair did not request counsel, after including in Fair's statement that he twice stated that he would not sign without counsel present, was (1) a violation of Fair's constitutional right to assistance of counsel and (2) was an ethical violation. See ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-1.2(b) (4th ed. 2017) (stating that the duties of the prosecutor include that they protect and respect the constitutional and legal rights of suspects and defendants). As this court has found, a prosecutor is the representative of all the people, including those accused of a crime, and is bound to safeguard the constitutional rights of those accused, as well as any other citizen. See *Jackson*, 2021 IL 124818, ¶ 52 (Neville, J. specially concurring); *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983); *Berger v. United States*, 295 U.S. 78, 88 (1935) (finding it is as much the prosecutor's "duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one").

¶ 205    Additionally, Mebane admitted that, in 33 other custodial statements he had drafted as a felony review prosecutor, the statements documented that the suspect had been treated well by the police. In the statement Mebane wrote for Fair, however, he wrote that Fair was treated well by the prosecutor but omitted his standard confirmation that the suspect was treated well by police. Further, in every other statement Mebane had written as a felony prosecutor, the detective present signed every page of the document and initialed any changes. Mebane offered no explanation for why, although present, Porter did not sign or initial the statement in this case.

¶ 206    Furthermore, I find inconsistencies in Mebane's testimony and find that not only was he not "extremely" credible, as the circuit court found, but rather equivocal: not easily or definitely understood. Contrary to the majority's acquiescence to the circuit court's finding that Mebane's trial testimony regarding Fair's physical condition was credible, including that petitioner looked fine, Mebane did not refer to Fair's physical appearance regarding his shin or his difficulty breathing in Fair's statement. See *supra* ¶ 94.

¶ 207    In addition, Mebane, after reviewing the written statement, testified at the circuit court evidentiary hearing that he had no independent recollection of this case. Mebane also testified that he did not recall how Fair looked on September 2.

However, at the evidentiary hearing, in response to a question of whether Mebane noticed any injuries to Fair he answered "No." I find no mention of Fair's injuries in the statement; therefore, there is no corroboration of Mebane's answer in Fair's written statement. Additionally, Mebane testified that Fair did not appear in distress and had no difficulty breathing, which also is not documented in Fair's written statement. Thus, Mebane's testimony regarding Fair's injuries—breathing difficulty and being in distress—was not only not documented in Fair's statement but is inconsistent with Fair's statement. Further, Mebane was not qualified as a medical doctor who could express an opinion on the effects interrogation would have on a person with asthma or the physical effects of depriving a suspect of medication or the psychological effects that 30 hours of interrogation would have on an individual.

¶ 208    At trial, Mebane testified that Fair stated he had been treated "good" by everyone; however, the written statement states that Fair was treated "good by ASA Mebane." I find that these inconsistencies make Mebane's testimony equivocal. Finally, we must not forget that Mebane testified that he had "no independent recollection" of Fair's case.

¶ 209    The majority notes that the State relies on an Area 2 document to rebut Fair's torture claims. *Supra* ¶ 94. The document is a "moving of arrestee out and into arrest/detention facility" report dated September 3, 1998. The report was produced, filled out, and signed by a representative of the State.

¶ 210    In light of the totality of the circumstances, the intake report should not have been considered by the court and does not rebut Fair's testimony. The intake report is ambiguous because question 8 reads: Are you presently taking any medication? Answer: Yes and No. See *infra* ¶ 223. Question 12A reads: Do you have any serious medical or mental problems? Answer: Yes and No. See *infra* ¶ 223. The ambiguous answers to questions 8 and 12A are unclear or inexact and cannot be used to prove whether Fair was taking medicine and whether he had serious medical and mental problems. The circuit court's attempt to use the intake report to establish Fair had no medical problems is against the manifest weight of the evidence. The circuit court cannot rely on this ambiguous report to rebut Fair's uncontradicted and uncontested claims of torture. See *Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) (Wood, J., concurring) ("a mountain of evidence indicates that torture was

an ordinary occurrence at the Area Two station of the Chicago Police Department"). Therefore, the circuit court's reliance on this intake report is misplaced, and it should not be used to rebut Fair's claims that his confession was induced by his police interrogators' torture.

¶ 211     In addition, the circuit court emphasized that Fair's claims were not consistent from one forum to the next. Minor inconsistencies in testimony do not destroy the credibility of witnesses. See *People v. Soteras*, 295 Ill. App. 3d 610, 620-21 (1998). Although the details of Fair's testimony and claims had minor inconsistencies over 20 years, they were insufficient to destroy his credibility in this case. Here, the core allegations have remained the same and have never been rebutted by the police interrogators. See *Gibson*, 2018 IL App (1st) 162177, ¶ 120. Fair has consistently claimed he was tortured, and his testimony about being deprived of food, medicine, sleep, and counsel while handcuffed to the wall has not changed, and I note that his claims are consistent with findings of similar acts of torture by McDermott, which have been documented in other cases. See *Jackson*, 2021 IL 124818, ¶ 34 (majority opinion).

¶ 212                    F. Fair's Confessions Were the Result of Torture

¶ 213     I maintain that the circuit court's finding that Fair's torture claims regarding his oral statement to the officers was not relevant to the admissibility of the unsigned inculpatory written statement taken by Mebane. Rather, I find that Fair's confession to Mebane was inadmissible because Fair presented unrebutted evidence that he was denied the assistance of counsel when making the statement and that he was tortured by interrogating officers McDermott, Przepiora, Brown, and Porter during 30 hours of interrogation that culminated in Fair's coerced inculpatory confession. See *Beecher v. Alabama*, 389 U.S. 35, 38 (1967) (reasoning that there is an inescapable conclusion that a confession is involuntary if the confessor has been threatened at gunpoint to speak his guilt).

¶ 214     The majority finds that the Act "requires the circuit court to determine whether a petitioner has shown by a preponderance of the evidence that (1) torture occurred and (2) resulted in a confession that was (3) used to obtain a conviction." *Supra*

¶ 79. The majority also states that, although voluntariness is not at issue under the Act, courts applying the Act should weigh the totality of the circumstances on a case-by-case basis. *Supra* ¶ 87. Thus, I find that voluntariness, if not at issue, is relevant as to whether torture resulted in a confession.

¶ 215 Illinois courts have for decades used a specific test in deciding whether the effect of earlier coercive circumstances has been attenuated, rendering a subsequent statement admissible. *Richardson*, 234 Ill. 2d at 258-59. The Supreme Court has found that, when a prior statement is coerced, (1) the time that passes between confessions, (2) the change in place of interrogations, and (3) the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession. *Strickland*, 129 Ill. 2d at 557 (citing *Oregon v. Elstad*, 470 U.S. 298, 310 (1985)); see *Mission Statement*, *supra* (explaining that to fall within the Commission's authority to act, or jurisdiction, the claim must be that an officer coerced a confession that was used against the defendant to obtain his conviction).

¶ 216 I find that the written statement taken by Mebane after Fair had been interrogated for 30 hours by four officers was contaminated by the officers' torture of Fair, because when Fair spoke to Mebane (1) there was little time lag between Fair's torture by the interrogators, from 1:30 p.m. on September 1 to 7 p.m. on September 2 and when he made the inculpatory confession that Mebane drafted at 9:32 p.m. on September 2, 1998, and that Fair refused to sign; (2) both the oral statement to the police interrogators and the written statement were made by Fair in the same interrogation room at Area 2; and (3) Porter, one of the police interrogators, was in and out of the room during the 30 hours of police interrogation and Fair's oral statement, and he was present for the written statement taken by Mebane, the assistant state's attorney. Therefore, I find a causal connection between the two statements, and I cannot find that there was a " 'break in the stream of events *** sufficient to insulate [Fair's last] statement from the effect of all that went before.' " *Strickland*, 129 Ill. 2d at 559 (quoting *Clewis v. Texas*, 386 U.S. 707, 710 (1967)); *Gibson*, 2018 IL App (1st) 162177, ¶ 97 (finding that where the alleged detective torturer is in the room when the prosecutor interviewed defendant, defendant's reticence in these circumstances hardly rebuts his allegations).

¶ 217 Without Fair's coerced inculpatory confession, the State had no case against Fair. Fair's unrebutted claims against McDermott and the unrebutted claims of

denial of food, sleep, medicine, and counsel establishes, by a preponderance of the evidence, (1) that torture occurred and (2) resulted in Fair's unsigned inculpatory confession written by Mebane and (3) that the confession was used to obtain Fair's conviction. I would find the Commission correctly found the "case against [petitioner] was practically non-existent without the [petitioner's] statement." *In re Claim of Fair*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.018-F, at 3). Finally, I would find the circuit court's finding that Fair's claims of torture were incredible was manifestly erroneous because Fair's claims are uncontradicted and unrebutted by the police interrogators.

¶ 218                          III. CONCLUSION

¶ 219      Commission rules define "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for the purpose of obtaining from that person a confession to a crime." 20 Ill. Adm. Code 2000.10. (2017). Specifically, Fair alleged that (1) he was arrested and placed in handcuffs; (2) he was handcuffed to a wall of the Area 2 police station and deprived of asthma medication, food, and sleep by his interrogators; (3) he was threatened with a gun and kicked in the shin by McDermott; (4) the torture (deprivation of food, medicine, and sleep) persisted for 30 hours; (5) the prosecutor entered the interrogation room at 9:32 p.m. and drafted a handwritten statement, but Fair refused to sign the written statement; and (6) he repeatedly invoked his *Miranda* rights during the 30 hours of interrogation, which the police officers and prosecutor ignored.

¶ 220      I find, based on the uncontradicted and unrebutted testimony of Fair, that the police officers' acts constituted torture. I also find, under the totality of the circumstances, that Fair's uncontradicted and unrebutted testimony proved, by a preponderance of the evidence, that his unsigned inculpatory written confession was the product of the police officers' acts of torture. I further find that the circuit court's finding that Fair's testimony was incredible was against the manifest weight of the evidence, because Fair's testimony stands unrebutted and the opposite conclusion is clearly evident.

¶ 221      I believe this court is obligated to reverse the circuit court and appellate court's judgments because Assistant State's Attorney Mebane had no personal knowledge

of what took place during Fair's interrogation and the four police interrogators failed to come forward at the circuit court's evidentiary hearing to rebut Fair's testimony. I think this court should draw a negative inference from the police interrogators' refusal to come forward to rebut Fair's probative testimony delineating the officers' misconduct. Therefore, I respectfully dissent from the majority's decision because this court cannot disregard or reject the testimony of Fair, an unimpeached witness, whose testimony was neither contradicted nor impeached by the State's police interrogators.

¶ 222       JUSTICE O'BRIEN joins in this dissent.

## MOVING OF ARRESTEE OUT OF & INTO ARREST/DETENTION FACILITY

| | DATE | TIME | TURNED OVER TO/ RECEIVED FROM | STAR/ EMP. NO | REASON | LOCKUP KEEPER OTHER DEPT. MEMBER |
|---|---|---|---|---|---|---|
| OUT | | | | | | |
| IN | | | | | | |
| OUT | | | | | | |
| IN | | | | | | |

## RECORD OF INTERVIEWS IN LOCKUP

| DATE | TIME | INTERVIEWER | STAR NO. | REASON | LOCKUP KEEPER OTHER DEPT. MEMBER |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

## RECORD OF VISITORS TO ARRESTEE

| DATE | TIME IN | TIME OUT | VISITOR'S NAME · ADDRESS · TELEPHONE | RELATIONSHIP | W C 'S APPROVAL (SIGNATURE) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**RECEIVING SCREENING RECORD FOR ARRESTEE TO BE HELD IN LOCKUP** — REFER TO GUIDELINES FOR DISPOSITION OF ARRESTEE. CPD-11 523 — NOTE: ALL "YES" ANSWERS REQUIRE ACTION — DATE _03 Sep 54_ TIME _018_

ARRESTEE'S NAME _FAIR Darrell_   C.B. NO _11161 022_   LOCKUP KEEPER'S NAME (PRINT) _Dejan_   STAR NO _875_

| LOCKUP KEEPER'S VISUAL CHECK | YES | NO | | LOCKUP KEEPER'S ARRESTEE QUESTIONNAIRE | YES | NO | REFUSE |
|---|---|---|---|---|---|---|---|
| 1 DOES ARRESTEE HAVE OBVIOUS PAIN OR INJURY? | ☐ | ☑ | 8 | ARE YOU PRESENTLY TAKING ANY MEDICATION? (For what ) | ☑ | ☐ | ☐ |
| 2 IS THERE OBVIOUS SIGN OF INFECTION? | ☐ | ☑ | 9 | (IF FEMALE) ARE YOU PREGNANT? | ☐ | ☐ | |
| 3 APPEARS TO BE UNDER THE INFLUENCE OF ALCOHOL/DRUGS | ☐ | ☐ | 10 | IS THIS THE FIRST TIME YOU HAVE EVER BEEN ARRESTED? | ☐ | ☑ | ☐ |
| 4 ARE THERE VISIBLE SIGNS OF ALCOHOL AND/OR DRUG WITHDRAWAL? | ☐ | ☑ | 11 | HAVE YOU EVER TRIED TO KILL YOURSELF OR DONE SERIOUS HARM TO YOURSELF? | ☐ | ☑ | ☐ |
| 5 DOES ARRESTEE APPEAR TO BE DESPONDENT? | ☐ | ☑ | 12 A | DO YOU HAVE ANY SERIOUS MEDICAL OR MENTAL PROBLEMS? (IF YES, specify problem under REMARKS) | ☐ | ☑ | ☐ |
| 6 DOES ARRESTEE APPEAR TO BE IRRATIONAL? | ☐ | ☑ | 12 B | ARE YOU RECEIVING ANY TREATMENT? (IF YES, specify under REMARKS) | ☐ | ☑ | ☐ |
| 7 IS ARRESTEE CARRYING MEDICATION? | ☐ | ☑ | | | | | |

PERSON TO BE NOTIFIED IN CASE OF EMERGENCY - NAME _NTOIA FAIR_   ADDRESS   TELEPHONE _821-6267_   RELATIONSHIP _Mother_

REMARKS _Claims to take medication for Asthma / Declines any Treatment at this time_

**SPECIAL DISPOSITION**
COMPLETE ONLY FOR ARRESTEES REFERRED OUT OR TO BE MONITORED

| REFERRED TO (Specify) | PLACED IN ONE-PERSON CELL NO. (for communicable disease cases) | PLACED IN TWO OR MORE PERSON CELL NO UNDER SPECIAL/CLOSE OBSERVATION (potential suicides) |
|---|---|---|
| | | |
| NOTE: LOCKUP KEEPER MUST SIGN IN ALL INSTANCES | LOCKUP KEEPER'S SIGNATURE | |

**RELEASE OF ARRESTEE FROM CUSTODY**

FOR THE FOLLOWING REASON(S), I HAVE DETERMINED THERE IS NOT SUFFICIENT CAUSE TO FURTHER DETAIN/CHARGE THE ARRESTEE.

Pet. Ex. 2

SIGNATURE - ARR OFF /DETECTIVE   STAR NO   UNIT | APPROVED - W/C - DETENTION FAC - STAR NO | DATE TIME RELEASED FROM CUST